Filed 2/19/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROMIER SIMMONS et al.,<br><br>        Defendants and Appellants. | A135668<br><br>(Alameda County<br>Super. Ct. No. C166214-A & B)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the written opinion filed on February 05, 2015, is modified by deleting the first portion of the first sentence of the third from last paragraph under II.A.1. and replacing it with "Simmons's attorney objected that Malbrough's statements did not meet the standards for withdrawing a plea, and the trial court agreed but stated:" The text that follows the colon remains the same.

As modified, the judgment is affirmed. This modification does not change the judgment. (Cal. Rules of Court, rule 8.264(c)(2).)

Dated: _____                    _____P.J.

1

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROMIER SIMMONS et al.,<br><br>     Defendants and Appellants. | A135668<br><br>(Alameda County<br>Super. Ct. No. C166214-A & B) |

Appellants Christopher Malbrough and Romier Simmons were convicted of numerous crimes in connection with a series of home robberies, and the trial court sentenced them both to life in prison. On appeal, they contend we must (1) reinstate a package plea agreement that the trial court withdrew after Malbrough asked for it to be withdrawn and (2) reverse their convictions for aggravated kidnapping based on insufficient evidence and instructional error. We reject these contentions, but we accept the parties' agreement that the matter should be remanded to the trial court to strike certain fines. We also direct the trial court to hold a court trial on the prior-strike allegations against Malbrough. The judgments otherwise are affirmed.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Malbrough and Simmons were arrested and charged in connection with 12 Oakland home-invasion robberies that took place between August 2 and November 24, 2010. The men would enter homes with guns drawn and rob the occupants of their money, jewelry, cell phones and other electronics.

1

Malbrough and Simmons initially agreed to plead no contest to various charges under a package plea agreement. The trial court, however, withdrew the agreement after Malbrough said he felt pressured into accepting the deal. A subsequent jury trial was held, and the jury convicted Malbrough and Simmons of dozens of felonies.[1] The convictions Malbrough and Simmons challenge on appeal involve kidnapping for the purpose of robbery under section 209, subdivision (b)(1) (aggravated kidnapping). Malbrough was sentenced to an indeterminate term of 19 years to life, plus a determinate term of 102 years. Simmons was sentenced to an indeterminate term of 14 years to life, plus a determinate term of 114 years.

---

[1] Malbrough was found guilty of the following crimes: 32 counts of first-degree residential robbery while personally using a firearm (Pen. Code §§ 211, 12022.5, subd. (a), 12022.53, subd. (b)—counts 1, 5-10, 18, 19, 29, 30-34, 36, 37, 39, 40, 43-45, 52, 53-55, 58, 60-62, 64, 65) (all further statutory references are to the Penal Code), four counts of home-invasion robbery in concert while personally using a firearm (§§ 211, 213, 12022.5, subd. (a), 12022.53, subd. (b)—counts 11, 14-16), three counts of first-degree residential robbery while personally armed with a firearm (§§ 211, 12022, subd. (a)(1)—counts 20-22), two counts of first-degree residential robbery without firearm allegations (§ 211—counts 59, 63), three counts of attempted first-degree residential robbery while personally using a firearm (§§ 211, 664, 12022.5, subd (a), 12022.53, subd. (b)—counts 23, 27, 35), and two counts of kidnapping to commit robbery (§ 209, subd. (b)(1)—counts 24, 28). Following no-contest pleas, Malbrough also was convicted of four counts of being a felon in possession of a firearm. (Former § 12021, subd. (a)(1)—counts 4, 13, 26, 42.)

Simmons was found guilty of the following crimes: 37 counts of first-degree residential robbery while personally using a firearm (§§ 211, 12022.5, subd. (a), 12022.53, subd. (b)—counts 1, 5-10, 18-22, 29-34, 36, 37, 39, 40, 43-46, 49-55, 58, 60-62, 64, 65), three counts of home-invasion robbery in concert while personally using a firearm (§§ 211, 213, 12022.5, subd. (a), 12022.53, subd. (b)—counts 11, 14, 15), three counts of attempted first-degree residential robbery while personally using a firearm (§§ 211, 664, 12022.5, subd (a), 12022.53, subd. (b)—counts 23, 27, 35), two counts of first-degree residential robbery without firearm allegations (§ 211—counts 59, 63), three counts of kidnapping to commit robbery (§ 209, subd. (b)(1)—counts 24, 28, 47), and one count of assault with a firearm while personally using a firearm (§§ 245, subd. (a)(2), 12022.5, subd. (a), 12022.53, subd. (b)—count 57). Following a no-contest plea, Simmons also was convicted of two counts of being a felon in possession of a firearm. (Former § 12021, subd. (a)(1)—counts 41, 48.)

## II.

### DISCUSSION

### A. *The Trial Court Did Not Err in Granting Malbrough's Motion to Withdraw from a Package Plea Agreement.*

Malbrough and Simmons first argue that the trial court improperly withdrew a package plea agreement after Malbrough specifically asked the trial court for that relief. We are not persuaded.

#### 1. Background

In August 2011, Malbrough and Simmons both pleaded no contest to 19 felony counts (one for each victimized family) in exchange for 26 years in state prison as part of a package plea agreement. The plea agreement was the result of settlement discussions among the parties and the trial judge that took place on "a number of dates." Simmons expressed some misgivings before entering his plea, stating it was a "very hard decision" and that, although he agreed to the plea deal freely and voluntarily, he was "battling within [him]self." After he remarked to the trial court he "[c]ould have had a little bit more time" to discuss the agreement with his attorney, the trial court called a recess so that Simmons could do so. After a recess of about an hour and 40 minutes, Simmons confirmed he had had enough time to talk with his attorney. Both Simmons and Malbrough were questioned about whether they had any further questions about the plea agreement and whether they understood all the rights they were giving up in exchange for the agreed-upon sentence, and they both confirmed they understood the terms of the plea agreement before they entered their pleas. The judge found that both Simmons and Malbrough knew what they were doing and understood the consequences of their actions. After accepting both defendants' pleas, the trial court referred the matter to the probation department to prepare presentence reports.

At the beginning of the sentencing hearing, which was held about a month later, Simmons's attorney informed the trial court that Simmons wanted to withdraw his plea because there was "newly discovered evidence" other people were involved in the crimes and because a codefendant pressured Simmons to enter a plea. The court scheduled

another hearing for a few weeks later so Simmons's attorney could look into the possible withdrawal.

When the parties reconvened in late October, Simmons's attorney reported that Simmons no longer wanted to withdraw his plea. The trial court then had a lengthy discussion with Simmons to confirm that he was not pressured to enter into the plea agreement and that he wanted to proceed with sentencing. Malbrough then asked to address the court about his own desire to withdraw his plea, stating, "I just been thinking, your Honor, and I was thinking in my cell, and I was like 26 years? I know it sounds like a good deal for the Court, because they don't have to do it. But just it's a long time." He also stated that he had been accepted to a program at Delancey Street and was "asking for a chance at that program to get my life together while I'm young, try to do a change." Malbrough's attorney told the court he had informed his client it would be "a mistake" to withdraw his plea, and there was no basis for the withdrawal other than "a general buyer's remorse." The trial court told Malbrough, "I just really wonder what you [Malbrough] are thinking," considering that "[you are facing] 314 years . . . give or take." The court also pointed out that section 1018 permits a defendant to withdraw a plea only upon a showing of good cause. Both Malbrough's and Simmons's attorneys agreed there was no basis to withdraw Malbrough's plea. But when asked if he had anything to add, Malbrough stated, "I feel like I was pressured into taking the deal, to be honest." The following exchange then took place:

"THE COURT: Really? Tell me about that.

"DEFENDANT MALBROUGH: By the Court, period. Just that if I didn't we would be going to trial.

"THE COURT: That's exactly what's going to happen if you withdraw the plea, you are going to trial. That's right. That's what you want?

"DEFENDANT MALBROUGH: That's what I'm prepared to do.

"THE COURT: Fair enough. Motion to withdraw the plea is granted, we're ready to try the case."

4

Malbrough's attorney objected that Malbrough's statements did not meet the standards for withdrawing a plea, and the trial court agreed but stated: "Mr. Malbrough [in] what is clearly an 11th hour 59th minute expression that he's articulated here today, which clearly I believe it appears to me that he is borrowing from words that just came out of my mouth about 15 minutes ago, but I'm at a point where there is so much sketchy behavior from all three defendants[2] in this case about this agreement that I've reached a point where I'm no longer comfortable with it, and I think it might be the best thing to do is simply proceed to trial. [¶] So I've reached the point where based on all things that Mr. Simmons has said over time and now Mr. Malbrough's disappointment about me not letting him go to Delancey Street for 2 years instead of state prison for 26, Ms. Bayl[e]ss's desire to truncate her sentence, just all of it, it's like standing on shifting sand and moving parts, and I've just reached a point where I'm uncomfortable about whatever the plea negotiations were that anyone—any of the defendants have accepted this in good faith and with the kinds of thoughts in mind that the cases and the statute call for. [¶] So I recognize no one wants to do a bunch of time in prison. I get that. But it may be sometimes we just need to try the case, and I've been thinking about this for some time. And with the various steps we've gone through, I think it's maybe wiser at this point to go forward with trial instead of pushing the plea to be completed. That's my sense of it."

The prosecutor noted that if Malbrough's motion was granted, "all offers to all defendants w[ould] be withdrawn" because "as everyone is aware this is a package deal." The court agreed that was "what's been on the table the whole way." The court concluded, "It just has struck me that as we have been unable to complete the sentencing here it's been one thing after another from the three of them. The aggregate effect is I've reached a level of discomfort about sort of the voluntariness of the deal, I suppose, is

---

[2] A third defendant, Kyra Bayless, was charged in connection with one of the home-invasion robberies and was a party to the original plea agreement. Her case later was severed from Malbrough's and Simmons's, and she is not a party to this appeal.

5

what I'm really wondering about out loud." After further discussion, the court confirmed there would be a trial and scheduled a pretrial hearing date of November 10.

All three defendants (Malbrough, Simmons, and Bayless) were present at the hearing on November 10 to discuss the upcoming trial. When the trial court granted a motion by Bayless to sever her case, the prosecutor stated, "So just [s]o we're all clear, that deal that was previously entered into is withdrawn. We had discussed potential offers for her [Bayless], but it would have to be a renegotiation." The court responded, "I'm rejecting the agreement pursuant to [section] 1190.5 [*sic*—apparently, a reference to section 1192.5]. That would be the technically correct way I think to say that. And then whatever discussions will be had [about a possible new plea agreement] will be had at a later point."

2. Analysis

The two sections of the Penal Code discussed during proceedings in the trial court are relevant to our discussion. Section 1018 allows the trial court to grant a defendant's request to withdraw a guilty plea any time before judgment when there is good cause for the withdrawal. And section 1192.5 provides that a trial court, even after approving a plea agreement, "may, at the time set for hearing on the . . . pronouncement of judgment, withdraw its approval in the light of further consideration of the matter." We discuss each of these sections.

Under section 1018, "[m]istake, ignorance or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a guilty plea. [Citations.] But good cause must be shown by clear and convincing evidence." (*People v. Cruz* (1974) 12 Cal.3d 562, 566.) Challenges to rulings under section 1018 usually arise where a defendant pleads guilty, later unsuccessfully tries to withdraw the plea, and then appeals the trial court's *denial* of the motion to withdraw. (E.g., *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) In these situations, the appeal will fail unless the defendant can show that the motion to withdraw the plea was supported by clear and convincing evidence of good cause. And it is settled that good cause does not include mere "buyer's remorse" regarding a plea deal, as Malbrough's attorney acknowledged below when

6

stating he had advised his client not to withdraw his plea. (E.g., *Cruz, supra*, at pp. 566-567 [defendant failed to specify nature of "confusion" when he entered plea]; *People v. Hunt* (1985) 174 Cal.App.3d 95, 103-104 [post-plea apprehension about anticipated sentence insufficient ground to compel trial court to permit withdrawal of guilty plea]; *People v. Knight* (1987) 194 Cal.App.3d 337, 344 [same; "buyer's remorse" is insufficient to establish good cause to set aside a plea].)

Malbrough and Simmons rely on these principles in arguing that the trial court abused its discretion when it *granted* Malbrough's request to withdraw his plea. This reliance is misplaced. Rather than denying a motion to withdraw, the trial court here granted the precise relief Malbrough requested. We agree with respondent that Malbrough cannot complain on appeal that "the court did exactly what he insisted upon."[3] (*People v. Cooper* (1991) 53 Cal.3d 771, 827 [defendant barred from asserting that jury instruction on lesser offense should have been given where he insisted the instruction not be given].) "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court *at his behest*." (*People v. Wickersham* (1982) 32 Cal.3d 307, 330, italics added, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)

*People v. Webb* (1986) 186 Cal.App.3d 401 is instructive. In *Webb*, a defendant pleaded guilty to various sex offenses as part of a plea bargain where he agreed to a prison term of 60 years and the prosecutor agreed in exchange to drop other charges against him and not to pursue kidnapping and rape charges against him in another case. (*Id.* at pp. 405-406.) The Court of Appeal affirmed the conviction but remanded for resentencing. (*Id.* at p. 406.) On remand, the defendant was sentenced to 59 years in prison, and he again appealed. (*Ibid.*) In his second appeal, he argued for the first time that his conviction should be set aside because the trial court lacked authority to accept

---

[3] Because Simmons was a party to the plea agreement (*People v. Shelton* (2006) 37 Cal.4th 759, 767), we conclude he has standing to challenge the granting of Malbrough's motion. But a consequence of being party to a package plea agreement is being bound by the consequences of a codefendant's withdrawal.

the original plea under section 1192.7, subdivision (a), which limits plea bargaining in certain situations where a defendant is charged with sex crimes. (*Webb*, at pp. 409-410.) The appellate court rejected this argument on multiple grounds, including estoppel. (*Id.* at pp. 410-411.) The court concluded that under the circumstances, the defendant should be estopped from using section 1192.7 "as a shield after consenting to the acceptance of a plea bargain." (*Webb*, at p. 412.) Although here Malbrough and Simmons challenge the granting of a motion to withdraw a plea bargain and not the underlying plea bargain itself, the same principles of estoppel apply. Malbrough and Simmons cannot use section 1018's "good cause" requirement as a shield after Malbrough told the trial court, in effect, that good cause existed to withdraw the plea agreement.

Furthermore, and regardless of section 1018, the trial court acted within its legitimate authority under section 1192.5, the separate statute authorizing it to withdraw its approval of plea agreements under circumstances that were present here. The written plea agreements informed Malbrough and Simmons, as required by section 1192.5, that the terms of the plea agreement were not binding on the trial court, and the court could reject the agreement before sentencing defendants under it. The statute provides that a trial court " 'may, at the time set for the hearing on the . . . pronouncement of judgment, withdraw its approval [of a plea] in the light of further consideration of the matter.' " " '[I]mplicit in the language of section 1192.5 is the premise that the court, upon sentencing, has broad discretion to withdraw its prior approval of a negotiated plea.' [Citation.] Such withdrawal is permitted, for example, in those instances where the court becomes more fully informed about the case [citation], or where, after further consideration, the court concludes that the bargain is not in the best interests of society." (*People v. Superior Court* (*Gifford*) (1997) 53 Cal.App.4th 1333, 1338.)

Although the trial court did not mention section 1192.5 when it granted Malbrough's motion to withdraw his plea, it later explained that allowing Malbrough to reenter a plea of not guilty was done under this statute, and on yet another occasion the prosecutor also stated (without objection) that the trial court had withdrawn its approval under the statute. Malbrough and Simmons argue that the trial court's reference to section 1192.5

8

amounted to "revisionist history," because nothing in the record supports the notion that the court withdrew its approval of the plea agreement. To the contrary, the trial court explained at length its concerns that even after they pleaded under the agreement, all three defendants continued to express doubts about their pleas and the sentences they would receive under them. The court was at that point "uncomfortable" that "any of the defendants have accepted this in good faith" and felt the agreement was "like standing on shifting sand and moving parts." The court also questioned "the voluntariness of the deal" in light of defendants' statements.

And the trial court was right to be concerned. "It has long been established that guilty pleas obtained through 'coercion, terror, inducements, subtle or blatant threats' are involuntary and violative of due process." (*In re Ibarra* (1983) 34 Cal.3d 277, 287, disapproved on another ground in *People v. Howard* (1992) 1 Cal.4th 1132, 1175-1178.) "Such coercion is a *particular danger in the package-deal plea bargain context*." (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 124-125, italics added.) "Extraneous factors not related to the case or the prosecutor's business may be brought into play [in package-deal plea agreements]. For example, . . . a defendant may fear . . . that his codefendant will attack him if he does not plead guilty. Because such considerations do not bear any direct relation to whether the defendant himself is guilty, special scrutiny must be employed to ensure a voluntary plea. '[P]lea bargaining of adverse or lenient treatment for some person *other* than the accused . . . might post a greater danger of inducing a false guilty plea . . . .' " (*Ibarra*, at p. 287, original italics.) "[A] trial court should carefully scrutinize pleas in which the defendant shares a special relationship with a person who has been promised a benefit contingent on the defendant pleading guilty . . . ." (*Sandoval*, at p. 125.) The trial court here did just that when it stated its concerns with the plea deal and concluded that defendants' "sketchy behavior" left the court "no longer comfortable" with it. It did not abuse its broad discretion in withdrawing its approval of the plea agreement. (*Gifford*, *supra*, 53 Cal.App.4th at p. 1338.) We therefore need not address defendants' arguments over the proper remedy.

9

## B. Malbrough and Simmons Were Properly Convicted of Aggravated Kidnapping.

Malbrough and Simmons were each convicted of two counts of aggravated kidnapping in connection with a home robbery that occurred on September 2, 2010. Simmons was convicted of an additional count of aggravated kidnapping in connection with a home robbery that occurred on November 12, 2010. On appeal, defendants argue that these convictions cannot be sustained because they are supported by insufficient evidence, and the jury was improperly instructed. We disagree.

### 1. Substantial evidence supports the aggravated kidnapping convictions.

We begin by discussing the evidence presented about the two home robberies.[4]

#### a. The September 2, 2010 home robbery.

On the night of September 2, 2010, T.T. was playing games with his friend T.N. and other friends and family members at T.T.'s two-story home in Oakland. T.T. and T.N. went outside around 11:45 p.m. to retrieve an item from T.N.'s car. They both walked down the stairs of the house to the driveway where the car was parked, retrieved the item from the trunk, then walked back to the house. When they were about halfway up the stairs, they turned around and saw Simmons holding a gun pointed at them and walking toward them. Simmons told them to be quiet and to come back down the stairs. T.T. and T.N. walked down the stairs, and Simmons patted them down and demanded money. Malbrough, who also was carrying a gun, joined them around this time, and he and Simmons began discussing how they would go inside the house and get money. T.T. and T.N. at first had their hands up, but after a few cars drove by they were told to put them down, which made T.T. feel scared and vulnerable because people driving by would not realize they were "in trouble" and would instead think the four of them were "out there just hanging out."

---

[4] As a reviewing court, we " ' "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent.' " (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153.)

Malbrough and Simmons eventually directed the two victims back up the stairs to the front door of the house, where the four of them stayed "for quite a bit." Malbrough looked in the windows and told Simmons that he saw small dogs, and Simmons asked how many people were inside the house. T.T. told him "you don't want to go in there, there's a lot of people, there's a lot of girls that will scream, you do not want to go in there. If you guys wanted to leave now we are not going to call the cops. We don't got anything for you." Simmons told T.T. it was "up to [him] to keep [his] family safe" and shoved his gun deeper into his spine, at which point T.T. felt he "had no choice" but to enter the house.

T.T. opened the door, and all four men walked inside, with Simmons's gun still in T.T.'s back. T.T. heard one of the guns being cocked. T.T. told his family to "calm down, these guys [referring to Malbrough and Simmons] just want the money, just give it to them and they'll leave." T.T.'s cousin at first thought T.T. was joking, but then Malbrough walked toward T.T.'s sister and showed people in the room his gun. The occupants got down on the ground after they were ordered to do so, except that T.T. at one point was allowed to get up to put the dogs in a bathroom after one of the defendants threatened to shoot the dogs if they did not calm down. T.T. then returned to the ground. One of the robbers (T.T. could not remember which one) told T.T. and T.N. to remove their clothing so that they would not chase after them, and one robber stayed with them at all times while the other walked around the house looking for valuables.

Malbrough and Simmons ultimately left with two rings, a diamond necklace, phones, wallets, money, purses, and a backpack.

b. The November 12, 2010 home robbery.

On the evening of November 12, 2010, M.B., a man in his early 30s, returned from a fishing trip with his two daughters to his home in Oakland. After M.B. pulled into his driveway and got out of his car, Simmons approached him from behind with a gun and told M.B. to turn around and not say anything or he (Simmons) would kill M.B.'s family. Simmons held a gun to the back of M.B.'s head, took M.B.'s wallet out of his pocket, and ordered M.B.'s 11-year-old daughter out of the car. Simmons then told the two of them

11

to go inside their house while M.B.'s seven-year-old daughter remained in the back of the car where she was asleep.

M.B. and the older daughter walked toward their house, which required walking behind a tree that made it more difficult to view them. M.B. saw his brother-in-law come out of the house, and around this time a second man joined Simmons and held a gun to the brother-in-law's chest. When M.B. arrived at the door, he tried to prevent the men from entering his home by blocking the door so that his wife could see him, but Simmons shoved him inside. The man who had joined Simmons turned off the outside porch light, which further prevented M.B.'s wife from seeing them before they entered. Once all four men were inside, M.B. and other family members in the home were ordered into the kitchen at gunpoint. Simmons and the other man then told everyone to hand over their jewelry, and they took M.B.'s wedding band, a necklace, watches, and another ring. Simmons then ordered M.B. into a bedroom and told him to lie on a bed while Simmons continued to go through cabinets and drawers. M.B. stayed on the bed until police arrived.

### c.  Analysis

Malbrough and Simmons argue the evidence from these two home robberies is insufficient to support their convictions for aggravated kidnapping because any movement of their victims was incidental to the robberies and did not increase the victims' risk of harm. We disagree.

Section 209, subdivision (b)(1) provides that "[a]ny person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole."  "A defendant may be convicted of kidnapping for robbery when the kidnapping and the intended robbery pertain to different victims." (*People v. James* (2007) 148 Cal.App.4th 446, 452-453.)  But aggravated kidnapping is committed *only* "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).) The statute previously required that the movement *substantially* increase the risk of harm

12

to a victim, but it was amended in 1997 to require only that the movement increase the risk of harm, but not that the increase be substantial. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 978, 982.)

The jury considers both whether the movement was more than merely incidental to a crime and whether there was an increased risk of harm to the victim. As to whether the movement was more than merely incidental to the commission of the crime, "the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy" this element. (*People v. Vines* (2011) 51 Cal.4th 830, 869-870.) As to whether the movement increased a victim's risk of harm, the jury considers " ' "such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' " (*Id.* at p. 870; see also *People v. Nguyen* (2000) 22 Cal.4th 872, 885-886 [increased risk of harm may be physical or psychological in nature].) "There is no rigid 'indoor-outdoor' rule by which moving a victim inside the premises in which he is found is *never* sufficient asportation for kidnapping for robbery while moving a victim from inside to outside (or the reverse) is *always* sufficient. [Citation.] Nonetheless, it has been held that defendants who have moved their victims within the premises in which they were found did not increase the risk to the victims [citations]." (*People v. James*, *supra*, 148 Cal.App.4th at p. 456, original italics.) Simply stated, "the movement must be more than incidental *and* must increase the inherent risk of harm." (*People v. Hoard* (2002) 103 Cal.App.4th 599, 602, italics added.) Application of the foregoing factors in a particular case "will necessarily depend on the particular facts and context of the case." (*People v. Dominguez*, *supra*, 39 Cal.4th at p. 1153.)

Here, ample evidence supports the jury's determination that the victims were moved more than incidentally and that the movement increased the victims' risk of harm. During the September 2, 2010 home robbery, Malbrough and Simmons moved their two

13

victims a significant distance up the front stairs and into T.T.'s home. This movement decreased the likelihood defendants would be detected and increased the victims' risk of harm. It allowed defendants to engage in additional and more dangerous crimes by hiding their victims from public view and providing access to additional victims, and it increased the possibility of something going awry and somebody getting hurt. (*People v. Vines*, *supra*, 51 Cal.4th at p. 870.) The movement not only increased the *risk* of harm to the victims, but it also caused additional harm *in fact*. T.T. testified about his understandably heightened fears when Simmons pushed a gun into his spine before they entered his home and when, once inside, he had to bear witness to threats to his family and friends. (*People v. Nguyen*, *supra*, 22 Cal.4th at pp. 885-886 [increased risk of harm may be based on psychological harm].)

Similarly, the victim's movement during the November 12, 2010 home robbery was more than incidental and increased the risk of harm to the victim. The victim was moved from his driveway, up his front stairs, and into his home. Once again, this movement provided Simmons with new opportunities to engage in additional and more dangerous crimes out of public view, and it increased the possibility of something going awry. And, as with the movement of T.T. and T.N. on September 2, this movement not only increased the risk of harm, but it also caused additional actual harm (particularly psychological harm) to the victim because he was forced to leave his young daughter asleep and alone in his car at night and, once inside, faced new threats to his family.

The cases upon which Malbrough and Simmons rely are distinguishable. In *People v. Daniels* (1969) 71 Cal.2d 1119, the victims were moved within their homes (*id.* at pp. 1123-1125), characterized by the court as "brief movements" that were "solely to facilitate" defendants' crimes. (*Id.* at p. 1130-1131.) The court concluded that "when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute" aggravated kidnapping. (*Id.* at p. 1140.) Here, by contrast, the victims were moved from outdoors to inside under circumstances that increased harm and their risk of additional harm.

14

Malbrough and Simmons correctly note that simply removing someone from public view does not *necessarily* satisfy the requirement that the risk of harm to a victim is increased. They rely on *In re Crumpton* (1973) 9 Cal.3d 463, where the court concluded that the risk of harm to a service-station attendant who was being robbed was not meaningfully increased by being forced to lie down behind a truck parked on the station's premises. (*Id.* at pp. 466-467.) The circumstances here are not the same. By moving the victims indoors into homes filled with the victims' friends and family members, Malbrough and Simmons substantially increased the victims' harm and risk of being further harmed. The other cases upon which Malbrough and Simmons rely also are inapposite because they involved less movement or movement within the premises of a robbery. (*People v. Stanworth* (1974) 11 Cal.3d 588, 598 [no evidence that "relatively brief movement" of victim removed her from public view]; *People v. Washington* (2005) 127 Cal.App.4th 290, 299 [movement of bank tellers was "entirely within the premises of the bank"]; *People v. Hoard*, *supra*, 103 Cal.App.4th at p. 607 [movement of victims to back of jewelry store was merely incidental to robbery and may have put them at *reduced* risk of harm because they were not at front of store where robber had gun].)

This case is akin to *People v. Ellis* (1971) 15 Cal.App.3d 66, decided by this division more than 40 years ago. The defendant in that case was accused of several robberies where he confronted women outside their homes, forced them inside, and then took their money and other property. (*Id.* at pp. 72-73.) Purporting to follow *People v. Daniels*, *supra*, 71 Cal.2d 1119, the trial court set aside the indictment against defendant under section 995. (*Ellis,* at pp. 67-68.) This court reversed, noting the asportation of the victims "from the street to their upstairs apartments was *essential* to the accomplishment of the criminal purpose," played "a 'significant role in the crimes of robbery' and certainly did 'facilitate the commission of a felony.' " (*Id.* at p. 73, original italics.) The movement increased the risk of harm to the victims because "[o]n the street violence must necessarily be kept to a minimum because of the obvious risk of discovery and apprehension. But in the [victims'] closed apartments the men would need have little fear of being hindered in their criminal plans . . . ." (*Ibid.*) As in *Ellis*, the movement of

15

the victims here was essential to the commission of robberies inside the homes, and it increased the harm and the risk of additional harm to the victims. (See also *People v. James*, *supra*, 148 Cal.App.4th at pp. 456-458 [under totality of circumstances, forcing employee at gunpoint from outside business to inside in order to commit robbery satisfied asportation element of aggravated kidnapping].)

Substantial evidence supports defendants' convictions for aggravated kidnapping.

### 2. The jury was properly instructed on aggravated kidnapping.

We next turn to defendants' argument that the jury was improperly instructed. Before they began deliberating, jurors were instructed under CALCRIM No. 1203 that to prove aggravated kidnapping the People were required to establish the following:

"1. The defendant intended to commit robbery;

"2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear;

"3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance;

"4. The other person was moved or made to move a distance beyond that merely incidental to the commission of a robbery;

"5. When that movement began, the defendant already intended to commit robbery;

"AND

"6. The other person did not consent to the movement.

"As used here, substantial distance means more than a slight or trivial distance. The movement must have *substantially* increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement." (Italics added.)

The italicized word "*substantially*" is omitted from the current version of CALCRIM No. 1203 because, as we mentioned, section 209, subdivision (b)(2) was amended in 1997 to eliminate the requirement that the movement substantially increase the risk of harm. It is unclear why the word was included in the instruction.

16

In any event, during jury deliberations, jurors sent a three-paragraph note asking for clarification about CALCRIM No. 1203. The part of the note that Malbrough and Simmons focus on is a question about element four of the instruction—the requirement that the victim "was moved or made to move a distance beyond that merely incidental to the commission of a robbery." The jury stated: "We are looking for a definition for 'merely incidental.'"

The trial court proposed providing the jury with the CALJIC instructions related to kidnapping to commit robbery (Nos. 9.50.1 and 9.54). Both defense attorneys asked that the trial court simply reread a passage of CALCRIM No. 200 stating that "[s]ome words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary[,] everyday meaning." The court agreed to repeat this passage, but stated it was inclined to also provide the CALJIC instructions, an approach the prosecutor supported. After further discussion, the trial court decided to give both CALJIC instructions.

The court first read CALJIC No. 9.54 (Kidnapping to Commit Robbery).[5] It then read CALJIC No. 9.50.1, which, in addressing whether movement of a victim is

---

[5] The instruction was given to the jury as follows: "Every person who with the specific intent to commit robbery kidnaps any individual is guilty of the crime of kidnapping to commit robbery, a violation of Penal Code Section 209(b)(1). The specific intent to commit robbery must be present when the kidnapping commences. [¶] The taking of personal property and the possession of another against the will from a person or immediate presence of that person accomplished by means of force or fear and with the specific intent to permanently deprive the person of his or her property. Kidnapping is the unlawful movement by physical force of a person without that person's consent for a substantial distance where the movement is not merely incidental to the commission of the robbery and where the movement substantially increases the risk of harm to the person moved over and above that necessarily present in the crime of robbery itself. [¶] . . . [¶] Brief movements to facilitate the crimes of robbery are incidental to the commission of the robbery. On the other hand, movements to facilitate the robbery that

17

substantial, states as follows: "[T]he determination by you of whether a particular distance moved was substantial and increased the risk of harm to the alleged victim depends upon a consideration of the totality of the circumstances involved in the case. Whether the alleged victim[']s forced movement was merely incidental to the robbery is necessarily connected to whether it substantially increased the risk of harm to the alleged victim. Distance moved is simply one factor. No minimum distance is required so long as the movement is substantial. [¶] Other factors you should consider are the scope and nature of the movement as well as the context of the movement including but not limited to whether or not the movement decreased the likelihood of detection, increased the danger inherent in an alleged victim's foreseeable attempts to escape, or enhanced the attacker[']s opportunity to commit other crimes." Finally, the trial court repeated portions of CALCRIM No. 200, that words or phrases not specifically defined in the instructions are to be applied using their ordinary everyday meanings, and that some instructions may not apply depending on the jury's findings about the facts of the case.

Malbrough and Simmons contend the trial court erred in providing CALJIC Nos. 9.54 and 9.50.1 to the jury because, according to them, the instructions insufficiently defined the concept of "merely incidental" movement. Although they stop short of claiming the CALJIC instructions are inaccurate, they argue that the instructions somehow confused the jury and did not "capture the essence" of the applicable caselaw. But the Supreme Court has stressed that whether movement of a victim is merely incidental to a crime "is *difficult to capture in a simple verbal formulation that would*

---

are for a substantial distance rather than brief are not incidental to the commission of the robbery. [¶] In order to prove this crime each of the following elements must be proved. One, a person was moved by the use of force or was compelled to move because of a reasonable apprehension of harm. Two, the movement of that person was caused with the specific intent to commit robbery and the person causing the movement had the required specific intent when the movement commenced. Three, the movement of the person was without that person's consent. Four, the movement of the person was for a substantial distance. That is a distance more than slight, brief or trivial. And five, the movement *substantially* increased the risk of harm to the person moved over and above that necessarily present in the crime of robbery itself." (Italics added.)

18

*apply to all cases.*" (*People v. Dominguez*, *supra*, 39 Cal.4th at pp. 1151, italics added.) Although a jury must consider the scope and nature of the movement as well as the environment in which the movement occurred, this "standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment" (*id.* at pp. 1151-1152), and "each case must be considered in the context of the totality of its circumstances." (*Id.* at p. 1152.)

We conclude that the instructions here sufficiently described what the People were required to demonstrate to prove that the victims' movement was not merely incidental to the robberies. Jurors were instructed that whether the movement was merely incidental to the robbery was necessarily connected to whether it increased the victim's risk of harm, and they were instructed to consider such factors as the distance moved, "the scope and nature of the movement as well as the context of the movement including but not limited to whether or not the movement decreased the likelihood of detection, increased the danger inherent in an alleged victim's foreseeable attempts to escape, or enhanced the attacker[']s opportunity to commit other crimes." (CALJIC No. 9.50.1.)

We disagree with defendants' arguments that the CALJIC instructions were somehow confusing, inconsistent with caselaw, or were signs that the trial court failed in its duty under section 1138 to adequately respond to jurors' request for clarification of an instruction. And given that the jury was correctly instructed on the elements of the crime, we reject Malbrough's argument that his constitutional rights were violated by a supposed failure to instruct on all elements.

We recognize that the CALCRIM instructions approved by the Judicial Council of California are "the official instructions for use in the state," and their use is "strongly encouraged" (Cal. Rules of Court, rule 2.1050(a) & (e))—*as they were in this case*. We also recognize that the user's guide preceding the instructions provides: "The CALJIC and CALCRIM instructions should never be used together. While the legal principles are obviously the same, the organization of concepts is approached differently. Mixing the two sets of instructions into a unified whole cannot be done and may result in omissions or confusion that could severely compromise clarity and accuracy. Nevertheless, for

19

convenient reference this publication includes tables of related CALJIC instructions." (1 Jud. Council of Cal., Crim. Jury Instns. (Fall 2014 ed.) p. xxii.) These guidelines undoubtedly provide sound advice to parties and courts when assembling a cohesive set of initial jury instructions. But it does not follow that providing a CALJIC instruction in response to a question about a CALCRIM instruction is necessarily confusing, and we reject Malbrough's suggestion that "mix[ing]" instructions in these circumstances amounted to per se error.

We find it worth mentioning that both the CALCRIM and CALJIC instructions were inconsistent with current law, but the technical mistakes actually *benefited defendants*. Jurors were originally instructed they were required to find that movement of their victims *substantially* increased harm to them, and the response given to them to their question contained in the CALJIC instruction also informed them they had to find that the movement *substantially* increased the risk of harm. In fact, the jury was only required to find that the movement increased the risk of harm. Far from undermining the verdicts, the jury instructions reveal the jurors necessarily concluded there was a substantial increased risk of harm to the victims, which was *more* than what was necessary to support the aggravated-kidnapping convictions.

Nothing in the way jurors were instructed warrants reversal.

### C. Multiple Theft Fines Must Be Stricken.

Without objection, the trial court imposed multiple theft fines under section 1202.5, subdivision (a) against both Malbrough and Simmons. Defendants argue, and respondent concedes, that this was error because the statute permits the imposition of a single $10 fine in a given case no matter how many robbery-related convictions a defendant may receive in that case. (*People v. Crittle* (2007) 154 Cal.App.4th 368, 371 [because multiple fines under § 1202.5, subd. (a) unauthorized under the statute, issue not forfeited by failure to object].) We accept respondent's concession and order the trial court on remand to strike all but one fine under the statute for each defendant.

20

*D. The Trial Court Must Adjudicate Malbrough's Prior-Conviction Allegations.*

We also remand to the trial court for a court trial on Malbrough's prior-conviction allegations. Before trial, Malbrough pleaded no contest to being a felon in possession of a firearm, which included an admission that he had been convicted of robbery in 2007 (thus making him a felon). Also before trial, Malbrough waived his right to a jury trial on sentencing-enhancement allegations he was convicted of that same robbery in 2007 and served a prison term in the case. The prosecutor informed the court she had submitted evidence Malbrough had served a prison term, and the court responded, "I'm not going to review that now, it's not necessary. If we get to a point where I need to look at that for purposes of a court trial on those allegations I will deal with it then." But no court trial was ever held. The trial court nonetheless imposed the sentencing enhancements that were based on the prior-conviction allegations. (§§ 667, subds. (a)(1) & (e)(1), 667.5, subd. (b), 1170.12, subd. (c)(1).)

There is virtually no doubt the allegations are true, as Malbrough's 2007 conviction was the basis for his status as a felon as part of his no-contest plea to the firearm count. But the trial court never adjudicated whether Malbrough served a prison term for the conviction after having told Malbrough he would receive such a trial. We therefore remand to the trial court for a court trial on the matter. (*People v. Barragan* (2004) 32 Cal.4th 236, 239, 259 [retrial of strike allegation permissible where insufficient evidence in appellate record to support true finding].)

*E. No "Cumulative Error" Justifies Reversal of the Judgment.*

Finally, we reject the argument that a cumulative assessment of the alleged errors identified on appeal compels reversal of the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 847.) Although we remand to the trial court on two limited issues, we otherwise find no error that warrants reversal, either separately or considered cumulatively.

## III.
### DISPOSITION

The trial court is directed to amend Simmons's abstract of judgment to reflect a single $10 fine under section 1202.5, subdivision (a). As modified, Simmons's judgment is affirmed.

The judgment against Malbrough is reversed in part, and we remand for a court trial on Malbrough's prior-conviction allegations. If the allegations are found to be true, the judgment shall be reinstated. Whatever the outcome of the court trial, the trial court is directed to amend Malbrough's abstract of judgment to reflect a single $10 fine under section 1202.5, subdivision (a).

The trial court shall send certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.

22

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Morris D. Jacobson |
| Counsel for Appellant Romier Simmons: | Jeffrey A. Glick, under appointment by the First District Appellate Project |
| Counsel for Appellant Christopher Malbrough | Linda M. Leavitt, under appointment by the First District Appellate Project |
| Counsel for Respondent: | Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General |