Filed 9/15/16  P. v. Ferguson CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LEON ERNEST FERGUSON,<br><br>        Defendant and Appellant. | A144768<br><br>(Contra Costa County<br>Super. Ct. No. 05-131170-3) |

Leon Ernest Ferguson appeals after a jury convicted him of multiple counts arising from four separate robberies.  He argues (1) his convictions of kidnapping for robbery (Pen. Code, § 209, subd. (b))[1] lack substantial evidence; (2) the trial court erred in limiting the testimony of appellant's expert witness; and (3) a prior prison term enhancement should be stricken.  We agree with appellant's final contention, and otherwise affirm.

BACKGROUND

*Robbery of Rosalez and Rios*

About 9:30 p.m. on February 13, 2011, Eleana Rosalez and George Rios were on the porch outside their apartment.  A man approached, pulled out a gun, and demanded money.  He took property from Rosalez and Rios; after asking Rosalez if she had anything in her bra, he put his hand inside her bra to check.  The man then told Rosalez

---

[1] All undesignated section references are to the Penal Code.

and Rios to open the front door and go inside. After they all entered, the man shut the door behind him. Rosalez's two-year-old son, Alexander, was inside the apartment with a pit bull puppy. When Alexander saw them, Rosalez asked the man to put his gun away and he slid the gun up his sleeve. The man told them to go upstairs and he followed them into the master bedroom. The man took some property and the puppy, told them to stay upstairs, took more property downstairs, and then left.

Rosalez told officers the perpetrator was an African-American male, 22 or 23 years old, about six feet tall, 170 to 180 pounds, and wearing a gray and green plaid, button up hoodie. Four days later, Rosalez identified appellant out of a series of six photographs. Rios did not recognize the robber in a photographic lineup four days after the robbery.

*Robbery of Pickett*

About 10:40 p.m. on the same night Rosalez and Rios were robbed, a man approached David Pickett outside his apartment, one or two blocks from Rosalez and Rios's apartment. The man robbed Pickett at gunpoint. Pickett told officers the robber was an African-American male, about 5 feet 10 inches tall, wearing a gray and blue checkered jacket over a gray hoodie, in his late 20s to 30s, and weighing about 150 or 160 pounds. In late March 2011, Pickett was shown a six person photographic lineup; he identified someone other than appellant as possibly the robber.

*Robbery of Dessureault and Hernandez*

About 11:20 p.m. on the same night as the prior two robberies, Joseph Dessureault and Jasmine Hernandez were in the parking lot outside Dessureault's apartment, which was located in the same apartment complex as Rosalez and Rios's apartment. Hernandez testified a man robbed them at gunpoint, reached into her bra to check for money, and then left.

Hernandez told police the robber was an African-American male with a dark jacket and gray hooded sweatshirt. Dessureault told the police the robber was an African-American male, between 20 and 30 years old. Four days after the robbery, Hernandez and Dessureault were separately shown a photographic lineup; Hernandez

2

thought one of the men—not appellant—looked familiar, and Dessureault identified appellant.[2]

*Robbery of Sam's Jewelers*

The next day, on February 14, 2011, about 10:30 a.m., Fazle Tiwana and Zulfiqar Malik were working in Sam's Jewelers, located across the street from the previous night's robberies. Three African-American men in their early 20s entered, looked at a ring, and left. One of the men soon returned and asked to see the ring again. The man then began to run out of the store with the ring; Tiwana grabbed his jacket and he fell to the ground, dropping his cell phone before he ran out the door. Tiwana gave the cell phone to the police.

Tiwana described the robber as about 5 feet 10 inches tall and 175 to 190 pounds. When shown a photographic lineup two weeks after the robbery, Tiwana did not identify anyone as the robber. At trial, he said appellant's face looked different than the robber's. Two weeks after the robbery, Malik identified appellant in a photographic lineup.[3]

*Cell Phone Evidence*

Police examined the cell phone dropped by the robber at Sam's Jewelers.[4] The phone contained two photographs that appeared to be "selfies." Appellant admitted to the police that he was the person in the photographs. The phone also contained a photograph of a pit bull puppy, taken on the morning of February 14, 2011. Rosalez identified the puppy in the photograph as the puppy that had been stolen from her the night before.

---

[2] At trial, Dessureault—who claimed not to remember almost any details about the robbery and admitted testifying to the grand jury about his fears of retaliation—testified that he had never seen appellant before in his life and that he picked appellant's photograph in the photographic lineup because Hernandez told him to pick it. Hernandez denied telling him which photograph to pick.

[3] At trial, Malik testified he did not remember the theft or any related details. He admitted testifying before the grand jury that he was afraid of retaliation if he testified against appellant.

[4] The cell phone provider did not require identification to become a service subscriber, and the name given for the registered subscriber was "Baby Honey."

In the week leading up to the robberies, there were well over 100 calls and texts between the cell phone and Julia Whitaker's phone, including several texts back and forth about 11:40 p.m. on February 13 and four calls on the morning of February 14. When asked by the police in a March 2011 interview for the name of his spouse or significant other, appellant identified Julia Whitaker. There were also two calls from the cell phone to appellant's mother during the days before the robberies.

*Handgun Evidence*

Rios, who had experience with guns from hunting, identified the gun used by the robber as a black, nine millimeter, semiautomatic handgun. Pickett told the police the gun was a black semiautomatic pistol. Dessureault told the police the gun was a black, nine millimeter, semiautomatic or .40 caliber glock-style handgun.

On February 18, 2011, appellant fled to December Carroll's residence when officers approached him for reasons unrelated to the robberies. The officers asked appellant where his gun was and appellant told them he had thrown it outside, changing his story several time regarding where it was. Carroll told police appellant entered her house with a gun and ran into one of the bedrooms. Police found a black, nine millimeter, semiautomatic handgun in the bedroom.

*Defense Evidence*

Dr. Deborah Davis testified for the defense as an expert in eyewitness identification. Her testimony is discussed in detail below.

*Verdict and Sentencing*

The jury found appellant guilty of kidnapping for robbery of Rosalez (§ 209, subd. (b)); kidnapping for robbery of Rios (§ 209, subd. (b)); first degree robbery of Rosalez (§§ 211, 212.5, subd. (a)); first degree robbery of Rios (§§ 211, 212.5, subd. (a)); sexual battery by restraint of Rosalez (§ 243.4, subd. (a)); being a felon in possession of a firearm (former § 12021.1 (current § 29900)); second degree robbery of Pickett (§§ 211, 212.5, subd. (c)); second degree robbery of Hernandez (§§ 211, 212.5, subd. (c)); second degree robbery of Dessureault (§§ 211, 212.5, subd. (c)); second degree robbery of Tiwana (§§ 211, 212.5, subd. (c)); and second degree burglary of Sam's Jewelers

4

(§§ 459, 460, subd. (b)). The jury also found true allegations that appellant personally used a firearm in connection with all kidnapping and robbery charges related to Rosalez, Rios, Pickett, Hernandez, and Dessureault. (§ 12022.53, subds. (a)(3), (a)(4), (b).) Appellant pled no contest to an additional count of being a violent offender in possession of a firearm. (§ 29900, subd. (a)(1).) The court found true an allegation that appellant had a prior conviction. (§§ 667, subd. (a)(1), 667.5, subd. (b).) The trial court sentenced appellant to state prison for a term of 46 years to life.

DISCUSSION

I. *Kidnapping for Robbery Convictions*

Appellant argues the kidnapping for robbery convictions lack substantial evidence because the forced movement of Rosalez and Rios from their front porch to the inside of their apartment did not substantially increase their risk of physical or psychological harm. We disagree.

Section 209, subdivision (b)(1), provides that "[a]ny person who kidnaps or carries away any individual to commit robbery [or other enumerated offenses] shall be punished by imprisonment in the state prison for life with the possibility of parole." By its own terms, this provision "shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).)[5] "These two elements are not mutually exclusive but are interrelated.

---

[5] This test was first articulated in *People v. Daniels* (1969) 71 Cal.2d 1119, which provided the movement must "substantially" increase the risk of harm. (*Id.* at p. 1139.) The Legislature omitted the word "substantially" when it codified the *Daniels* test in 1997 (see *People v. Vines* (2011) 51 Cal.4th 830, 870, fn. 20 (*Vines*)), and the parties dispute whether the applicable test requires the risk of harm be substantially increased, or just increased by any amount. Our Supreme Court has noted, albeit in dicta, that the codification "modified the asportation standard by eliminating the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim." (*Id.* at pp. 869–870 & fn. 20 [applying *Daniels* test because codification occurred after the defendant's crimes].) Appellant asserts the legislative history demonstrates the Legislature did not intend to modify the *Daniels* standard, but neither recites nor analyzes the applicable legislative history and has therefore forfeited this argument. (*People v.*

5

[Citations.] [¶] With regard to the first prong, the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy the first prong." (*Vines, supra,* 51 Cal.4th at p. 870.) The second prong " ' "refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' " (*Ibid.*) The risk of harm can be either physical or psychological. (*People v. Nguyen* (2000) 22 Cal.4th 872, 886.)

Two cases with strikingly similar facts have upheld kidnapping for robbery convictions. In *People v. Simmons* (2015) 233 Cal.App.4th 1458 (*Simmons*), the defendants, in two separate instances, approached victims in front of their homes; robbed them at gunpoint; forced them to enter their homes, where additional victims were present; and stole additional items inside the homes. (*Id.* at pp. 1469–1471.) After the jury convicted the defendants of kidnapping for robbery, the defendants argued the movement of the victims was incidental to the robberies and did not increase the victims' risk of harm. (*Id.* at p. 1471.) The Court of Appeal rejected the argument, finding the movement into the victims' homes "decreased the likelihood the defendants would be detected and increased the victims' risk of harm. It allowed the defendants to engage in additional and more dangerous crimes by hiding their victims from public view and providing access to additional victims, and it increased the possibility of something going awry and somebody getting hurt." (*Id.* at p. 1472.)

---

*Bryant* (2014) 60 Cal.4th 335, 363–364.) In any event, as we will conclude below, substantial evidence supports the convictions under either standard.

Similarly, in *People v. Ellis* (1971) 15 Cal.App.3d 66, the defendant and an accomplice approached four separate victims outside their apartments; robbed one of the victims on the street; forced or attempted to force all of the victims into their apartments; and, once inside the victims' apartments, stole items and in some instances committed additional crimes. (*Id.* at pp. 72–73.) The trial court set aside the indictment's counts alleging kidnapping for robbery. (*Id.* at p. 67.) The Court of Appeal reversed, finding "the asportation of the female victims from the public street to their confined upstairs apartments . . . did 'substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself.' [Citation.] On the street violence must necessarily be kept to a minimum because of the obvious risk of discovery and apprehension. But in the [victims'] closed apartments the men would need have little fear of being hindered in their criminal plans, which here also included sexual and other violent assaults on their victims." (*Id.* at p. 73.) Although the People discuss *Simmons* and *Ellis* at length in their brief, appellant made no attempt to distinguish them in his reply brief and we see no basis for any meaningful distinction.[6]

Appellant argues the movement of a robbery victim from an outdoor to an indoor setting does not automatically cause a substantial increase in the risk of harm. (See *Simmons, supra,* 233 Cal.App.4th at p. 1473 ["simply removing someone from public view does not *necessarily* satisfy the requirement that the risk of harm to a victim is increased"]; *People v. James* (2007) 148 Cal.App.4th 446, 456 (*James*) ["There is no rigid 'indoor-outdoor' rule by which moving a victim inside the premises in which he is found is *never* sufficient asportation for kidnapping for robbery while moving a victim

---

[6] *Simmons* did conclude the movement in that case, in addition to causing an increased *risk* of harm, "caused additional harm *in fact.* [One of the victims] testified about his understandably heightened fears when [the defendant] pushed a gun into his spine before they entered his home and when, once inside, he had to bear witness to threats to his family and friends." (*Simmons, supra,* 233 Cal.App.4th at p. 1472.) Rosalez's testimony about whether she was more afraid inside her house than outside is not entirely clear; in any event, the fact was not dispositive in *Simmons* but rather an additional piece of evidence supporting the conviction.

from inside to outside (or the reverse) is *always* sufficient.”].).)[7] However, a number of cases have concluded, in various factual settings, that the victim's movement from a public to a private location did substantially increase the risk of harm. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153 [affirming kidnapping for rape conviction where the movement “changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue”]; *People v. Shadden* (2001) 93 Cal.App.4th 164, 170 [“By moving [the victim] to the back room, [the defendant] placed her out of public view. This made it less likely for others to discover the crime and decreased the odds of detection. [Citation.] When he closed the door, he enhanced his opportunity to rape and injure her.”]; *People v. Jones* (1999) 75 Cal.App.4th 616, 629–630 [“The critical factor which substantially increased the risk of harm to [the victim] occurred when [the defendant] forced her to move the 40 feet [within a parking lot] in order to then push her into her car. Although the car alarm was sounding, once he pushed her into the car, she was no longer in public view as when she was in plain sight with appellant holding his hand over her mouth—a situation which would have aroused concern immediately in any onlookers.”]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 348 [movement of victim from exterior walkway to motel room meant “the likelihood of anyone detecting [the defendant] decreased dramatically” and “he had an enhanced opportunity to perpetrate any additional crimes he desired”]; see also *James, supra,* at p. 456 [“it has often been held that . . . defendants who moved their victims to more secluded or enclosed areas did substantially increase the risk [to the victims]”].) In this case, as in *Simmons* and *Ellis*,

---

[7] As appellant notes, there are cases reversing aggravated kidnapping convictions in circumstances where the victim was moved to a more secluded setting. (*In re Crumpton* (1973) 9 Cal.3d 463, 466 [service station attendant moved from a location near the service island to the ground behind a truck parked on the station premises]; *People v. Killean* (1971) 4 Cal.3d 423, 424 [“In the course of robbing a jeweler and his companion in the former's apartment, [the defendants] caused them to move across the threshold and through various rooms in search of valuables.”]; *People v. Williams* (1970) 2 Cal.3d 894, 899–900 [victim moved from public area of service station premises to the inside of a locked bathroom].)

the movement of Rosalez and Rios from the public location of their front porch to the interior of their apartment substantially decreased the likelihood of detection and increased appellant's opportunity to commit additional crimes—including crimes against an additional victim, two-year-old Alexander—without arousing the suspicion of passers-by. This movement substantially increased the victims' risk of harm.

Appellant argues Rosalez and Rios were at no greater risk of harm from the movement than they would have been had he broken into their apartment in the first instance and confronted them there. He cites no authority specifically providing that this is the appropriate test by which to measure the increase in risk of harm. To the contrary, such a test appears to be implicitly rejected by the analysis of *Simmons, Ellis,* and the other cases cited above finding an increased risk when the victim was moved from a more public to a more private location.

II. *Expert Testimony*

Appellant argues the trial court's ruling limiting the testimony of Deborah Davis, the defense expert on eyewitness identification, was in error and deprived him of his right to present a full defense. We disagree.

A. *Background*

Prior to Davis's testimony, the trial court held a hearing on the prosecutor's objection that her testimony would include studies involving wrongful convictions based at least in part on eyewitness testimony. The court noted, "there are plenty of other studies done with the objective of actually demonstrating in a scientific manner the fallibility of eye witness identification and there is no need to suggest to this jury that there are all of these cases, particular criminal cases, in which there may have been an incorrect result based on eye witness identification testimony." The court precluded the defense expert from referring to studies "relating to specific criminal convictions or groups of criminal convictions," noting, "[i]f for no other reason, I'm excluding [such testimony] under [Evidence Code section] 352."

Dr. Davis proceeded to testify at length. According to her testimony, "eye witnesses are much more inaccurate than people tend to expect that they are." People

9

process unfamiliar faces differently than familiar faces, and may not recognize the same unfamiliar face if there are changes in angle, facial expression, and context. Similar clothing may mislead eyewitnesses. People are much worse at correctly identifying members of a different race. A witness's observation is impacted by distance, lighting, whether the person is wearing a hat or hood, whether the witness has used any drugs or alcohol, and whether the surrounding scene is "complex" (i.e., filled with people and/or actions). When a weapon is present, a witness is less likely to correctly identify the perpetrator because the witness's focus tends to be on the weapon. High levels of stress also tend to negatively impact a witness's ability to identify a perpetrator. Memories fade over time and can be changed or distorted. Identification procedures can impact the accuracy of a witness's identification.

During her testimony, Davis discussed numerous different studies demonstrating these principles. The studies involved different populations—including college students, Egyptian police cadets, convenience store clerks, and soldiers—and included meta-analyses, which combine the results of a number of different experiments to determine the overall effect. Davis also discussed instances of actual misidentification; for example, she testified about studies in which researchers "went into police archives and they looked at all of the cases they could find in which a witness tried to make an identification." Because police "are supposed to construct lineups so you just have one suspect and everybody else . . . you know for sure they are not guilty," the researchers looked at whether the witnesses identified "the suspect or did they ID one of the known innocent foils?" Davis summarized the conclusion: "out of real live witnesses who did identify somebody in a lineup, you could see that over 30 percent --, sometimes a lot over 30 percent were identifying a known innocent foil." As another instance of actual misidentification, Davis compared photographs of perpetrators and people who were misidentified as those perpetrators.

During closing arguments, the prosecutor argued Davis "provided us with over 100 slides and all of these studies of college students, not actual crime victims but college

10

students."  In response, defense counsel argued "a lot of information she gave you came from case studies, not just student experiments."

B. *Analysis*

"When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on another ground by *People v. Mendoza* (2000) 23 Cal.4th 896, 914.)  However, "the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion." (*Ibid.*)  As relevant here, "any excess in the quantity or complexity of such testimony can be controlled by the court's power to limit the presentation of evidence" pursuant to Evidence Code section 352.  (*Id.* at p. 372; see also *id.* at p. 367, fn. 11.)

The trial court did not abuse its discretion in excluding the testimony under Evidence Code section 352.  The court could reasonably conclude evidence of wrongful convictions based on eyewitness testimony was cumulative of other evidence demonstrating the fallibility of eyewitness identification.  We disagree with appellant's argument that the ruling "significantly undercut the persuasive force of the defense eyewitness expert testimony."  Contrary to appellant's suggestion, the trial court's ruling did not preclude Dr. Davis from testifying about any "real world" studies, i.e., studies involving participants outside of a laboratory.  As an example of such a study, appellant points to studies of police files finding a substantial rate of actual misidentifications at police lineups, as discussed in *State v. Henderson* (N.J. 2011) 27 A.3d 872, 886–887.[8]

---

[8] *State v. Henderson, supra,* 27 A.3d 872, discussed these and other studies in the context of revising the state's framework for excluding unreliable eyewitness identifications with pretrial hearings and revising the state's jury instructions on eyewitness identifications. (*Id.* at pp. 877–878.)  The studies were introduced before a special master appointed to

Dr. Davis testified about precisely such studies. She also testified about other studies involving "real world" participants such as convenience store clerks and soldiers.[9] She testified at length and in great detail about the fallibility of eyewitness identification. The trial court's ruling did not substantially dilute the effectiveness of her testimony and was not an abuse of discretion.

Appellant's reliance on cases involving child sexual abuse accommodation syndrome ("CSAAS") does not alter our conclusion. CSAAS testimony is " '[e]xpert testimony on the common reactions of child molestation victims,' " and " 'is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citation] "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse . . . ." ' " (*People v. Brown* (2004) 33 Cal.4th 892, 906.) *People v. Bowker* (1988) 203 Cal.App.3d 385 reasoned that, "to provide the jury with relevant, accurate information regarding 'recent findings of professional research on the subject of a victim's reaction to [child abuse],' " the testimony "must be targeted to a specific 'myth' or 'misconception' suggested by the evidence" and "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id.* at pp. 393–394.) Appellant argues this framework could be applied to expert testimony about wrongful convictions involving eyewitness testimony. Assuming this to be the case, the availability of a possible approach to present the evidence does not render the trial court's exclusion of the evidence an abuse of discretion.

Finally, we reject appellant's contention that the trial court's ruling violated his constitutional right to present a defense. Appellant was permitted to present ample evidence with respect to his misidentification defense. Where, as here, " ' "there was no

evaluate scientific studies about eyewitness identifications; the case did not involve an expert witness who testified before a jury. (*Id.* at p. 877.)

[9] The prosecutor's comment during closing argument therefore did not accurately characterize her testimony, as defense counsel below pointed out.

refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense," ' " due process is not violated. (*People v. Boyette* (2002) 29 Cal.4th 381, 428; accord, *People v. Thornton* (2007) 41 Cal.4th 391, 452–453 ["short of a total preclusion of defendant's ability to present a mitigating case to the trier of fact, no due process violation occurs"].)

III. *Prior Prison Term Enhancement*

The trial court imposed a consecutive five-year enhancement for a prior serious felony, a 2007 armed robbery conviction. (§ 667, subd. (a)(1).) The court also imposed a consecutive one-year enhancement for the prison term resulting from the same conviction. (§ 667.5, subd. (b).) As the People properly concede, the second enhancement was in error and we will strike it. (*People v. Jones* (1993) 5 Cal.4th 1142, 1150 ["when multiple statutory enhancement provisions are available for the same prior offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply"].)

DISPOSITION

The judgment is modified to reflect the one-year enhancement imposed pursuant to Penal Code section 667.5, subdivision (b) is stricken and, as so modified, is affirmed. The trial court is ordered to prepare and forward to California's Department of Corrections and Rehabilitation an abstract of judgment modified accordingly.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A144768)

14