Filed 2/16/24  P. v. Redden CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B328856 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. VA150716 |
| v. | |
| AUSTIN HUNTER REDDEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lee W. Tsao, Judge.  Affirmed; remanded with instructions.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

───────────

Austin Hunter Redden drove under the influence of nitrous oxide and crashed his SUV. One of his passengers was killed and the other two were seriously injured. Charged with murder and driving under the influence causing injury with a prior, Redden entered into a plea agreement with the People. Redden then retained a new attorney and moved to withdraw his plea. The trial court denied the motion. We find no abuse of discretion and therefore affirm Redden's conviction. We remand for the trial court to address one error in sentencing and to correct the abstract of judgment.

## FACTS AND PROCEDURAL BACKGROUND

1. ***Redden runs a red light, loses control of his Chevrolet Suburban SUV, and rolls it*[1]**

On the morning of May 13, 2019, Diego Castillo was hanging out with his best friend Jacob Scianni, smoking marijuana. Redden came and picked them up in his Chevy Suburban. Redden's girlfriend Andrea Sandoval was with him. She was in the front passenger seat, Castillo sat in the left rear passenger seat, and Scianni sat in the right rear passenger seat.

Castillo saw a tank of nitrous oxide—also known as "noz"—in the third row seat of the Suburban. The plan was "[j]ust to go eat and hang out." While they were driving, Castillo heard a "loud" noise coming from the noz tank, "like air getting out." He heard the sound "[p]robably like three or four times." Castillo wasn't paying that much attention; he was on his phone "paying attention to the bluetooth."

Five or ten minutes after he heard the sounds, Castillo "felt the car jolt and ride up on the center divider." The

---

[1]     As the parties resolved the case before trial, we take our statement of facts from the testimony at Redden's preliminary hearing.

2

Suburban "start[ed] to go from all the way to the left-hand side to the right-hand side." Castillo shut his eyes and "everything went in slow motion." He "woke up after." Someone "pulled [him] out from the car." At the preliminary hearing, Castillo testified he was "suffering from . . . memory loss problems" so he "[didn't] remember anything."

On that afternoon of May 13, Hugo Ramirez Gonzalez was driving eastbound on Rosecrans in Norwalk. He was stopped at a red light at Pioneer. Ramirez Gonzalez saw a black Suburban accelerate through the intersection and then run a red light. The driver of the Suburban lost control. It hit the center median and then hit a tow truck. The Suburban flipped over.

Deputy Trevor Ctibor arrived at the scene. Ctibor saw a Chevrolet Suburban "turned upside down in eastbound lanes facing westbound." A man—later identified as Castillo—was sitting on the curb. A woman—presumably Sandoval—was lying on the sidewalk on Rosecrans, unconscious but breathing. A man later identified as Redden was "pacing." "[H]is eyes were red and glossy [*sic*]."[2] "His speech pattern was a little slow." His responses to Ctibor's questions seemed delayed.

Inside the Suburban Ctibor found "a canister resembling nitrous oxide" and "balloons scattered about." Video from a nearby business showed the black Suburban going eastbound at "what appear[ed] to be a high rate of speed." It "went up on the center divider" "and lost control," going "across the eastbound lanes." No brake lights appeared. In the opinion of the investigating officer, the driver "[a]ppeared to have no control of the vehicle."

---

[2]     It's likely the deputy meant "glassy."

3

Anaheim police officer Matt Ellis, a drug recognition expert, was asked to go to the hospital on May 13, 2019. He arrived around 6:20 p.m. Redden was lying in a hospital bed and appeared to be sleeping. Officers woke him up "easily." Ellis gave Redden a breath alcohol test that "came back zero or no alcohol."

According to Ellis, "[r]ecreational[ ]" users of nitrous oxide typically ingest it by inhaling it out of a balloon or "directly into the mouth" from a pressurized canister. Nitrous oxide can cause a person to be "drowsy"; if the person is "in an excited state, it can cause [him] to have time and distance perception problems." It can cause "euphoria." It also "ultimately [can] lead to unconsciousness and death."

A person under the influence of nitrous oxide may be "unconscious," "almost unable to care for themselves." "They may be barely able to stand up or sit up without falling over." Nitrous oxide can cause body numbness, lack of coordination, blurred vision, confusion, dizziness, and lightheadedness. It's "very short lasting."

When Ellis examined Redden's eyes, he "saw horizontal gaze nystagmus maximum deviation"[3] and "lack of smooth pursuit as his eyes traveled across the horizontal [plane]." Ellis also saw "lack of convergence."[4] Horizontal gaze nystagmus and lack of convergence can be caused by certain depressants, "dissociative anesthetics," and inhalants. Lack of convergence

_____

[3]    Horizontal gaze nystagmus is an "involuntary jerking of the eyes as they travel across the horizontal [plane]."

[4]    Lack of convergence is "[w]hen the eyes are unable to . . . change their focus from far to close. And as the eyes try to cross, one or both eyes will come from the point of convergence in the middle back out."

4

also can be caused by these "drug categories" as well as by cannabis. Ellis noticed Redden's eyes were red and watery.

Redden told Ellis he had used nitrous oxide in the past and that day he had inhaled four balloons before the collision. In Ellis's opinion, Redden "displayed symptomology of being under the influence of a central nervous system depressant and cannabis."

Scianni died "as a result of the injuries he sustained during the collision." Sandoval suffered two neck fractures and a broken arm. She had "bleeding in the brain and brain injury." She was unconscious for three days and "they put staples in [her] head." She has "a big scar" and still feels numbness, "like tingling," in her hand and arm. Sandoval testified she also had "a little bit of a memory problem."

Castillo's "whole eyelid" of his left eye was "cut open" and he had 24 stitches on it. He had "a severe concussion" and was in a neck brace for about 10 weeks. Castillo's neck was "shattered" and he was unable to go back to work.

## 2. *The charges and plea agreement*

The People charged Redden with the murder of Scianni (count 1) and with driving under the influence (DUI) of a drug causing injury within 10 years of another DUI offense (count 2). The People alleged Redden personally inflicted great bodily injury on Castillo and Sandoval under Penal Code section 12022.7, subdivisions (a) and (b), respectively. The People also alleged Redden had caused death or bodily injury to more than one victim and thus was subject to additional punishment under Vehicle Code section 23558. Finally, the People alleged Redden had suffered a prior DUI conviction in March 2017.

Redden was arraigned on November 7, 2019. He was represented by private counsel, Carlo A. Spiga. The case was continued a number of times over the next two years, due in part

to the pandemic.  On January 27, 2022, counsel advised the court the parties had reached a plea disposition.  Spiga told the court, "The defendant is going to be entering a plea today to count 1 and count 2.  The sentence on count 1 that is being recommended by the D.A.'s office is the 15 to life.  The count 2 sentence that's being recommended is eight years to run concurrent.  That's the term of this deal."

Counsel continued, "That eight years is broken down as follows:  He will be pleading to Vehicle Code section 23153(f) for a total of three years; he will be admitting the bodily injury enhancement that's also alleged under that count as Penal Code section 12022.7(b) for an additional five years, that eight years to run concurrent to count 1. [¶] He will be admitting his prior conviction under Vehicle Code section 23560 . . . ."

The court stated, "So that's a total term of 15 years to life.  And you'll calculate credits, Mr. Spiga?"  Spiga replied he'd already calculated them.  The court asked Redden, "Mr. Redden, is that your understanding of the agreement?"  Redden answered, "Yes, Your Honor."

The court then explained to Redden the charges and allegations.  The court stated both of the counts to which Redden was pleading were strikes.  Redden had initialed and signed a *Tahl* waiver form.[5]  Handwritten entries on the form stated Redden would be pleading to second degree murder with a term of "15–L" and a violation of Vehicle Code section 23153, subdivision (f), with an enhancement of five years under Penal Code section 12022.7, subdivision (b).[6]  Redden confirmed he

---

[5]     *In re Tahl* (1969) 1 Cal.3d 122.

[6]     Handwritten on the form under "aggregate term of imprisonment" is "23–L."  Had a jury convicted Redden of both

6

understood the charges against him. The court asked, "Did you read and understand everything on the form with the assistance of your lawyer Mr. Spiga?" Redden replied, "Yes, Your Honor."

The court then detailed all the rights Redden had that he'd be giving up by entering his pleas as well as the consequences of those pleas. Redden confirmed he understood those rights and consequences. The court asked, "Have you had enough time with Mr. Spiga to discuss this case and the terms of the offer?" Redden replied, "Yes, Your Honor." The court asked Redden, "Do you have any questions before I take your pleas?" Redden answered, "No, Your Honor."

Redden then pled guilty to the charges and admitted the great bodily injury and prior conviction allegations. The court found Redden had knowingly and intelligently given up his rights, he had freely and voluntarily entered his plea and admitted the enhancements, and there was a factual basis for the plea. Spiga asked to put over sentencing until early March so he could prepare "*Franklin* materials."[7]

3.   ***Redden's motion to withdraw his plea, the evidentiary hearing, and the court's ruling***

On March 3, 2022, Redden appeared before the court. Spiga was present as well. The prosecutor told the court she'd

---

counts and found the allegations true—or had Redden pleaded to the information as filed—his maximum exposure would have been 24 years to life: 15 years to life for the second degree murder, the upper term of three years for the DUI causing injury with a prior, plus five years for the infliction of great bodily injury on Sandoval, plus one year for the multiple victim enhancement.

[7]   See *People v. Franklin* (2016) 63 Cal.4th 261. Redden was 21 years old when he committed the crimes.

been "notified by a new attorney" for Redden that he wished to substitute in. Because Scianni's family members had come to court, and new counsel—Andrew Stein—had not filed a substitution of attorney or a motion to continue the sentencing (nor did he appear that day), the court proceeded with victim impact statements (without any objection by Redden). Spiga then asked the court, on Stein's behalf, to continue the sentencing. The court put the matter over to early April.

Stein appeared on April 6 and made an oral motion to substitute in as counsel for Redden. At Stein's request, the court continued the case to mid-June. The case later was continued four more times. On September 29, 2022, Stein filed, on Redden's behalf, a motion to withdraw his plea. Redden asserted Spiga had "rendered ineffective assistance" and "thus deprived" him of his Sixth Amendment rights. Stein stated a defendant convicted of murder does not qualify for good conduct credits. In an attached declaration, Redden declared Spiga had told him he "would serve between five and eight years and then [he] would be paroled." Redden stated, "I have since been informed that I will not be eligible for parole for fifteen years, and that contrary to what Mr. Spiga told me, the chances of my release at my first hearing are nowhere near certain." Redden declared, "Had I been aware that there was a substantial likelihood that I would not be released from prison for twenty [*sic*] years, and that I could potentially remain in prison for the rest of my life, I would have insisted that Mr. Spiga continue to negotiate for a better disposition, or proceed to trial."

Redden also attached declarations by two family members and two other individuals: his sister Makenna; his mother Graciela; Joshua Loebl, who stated he was "a friend and coworker" of Makenna; and Tulia Mora, who stated she was

8

"a close personal friend of Grace [*sic*] Redden" (perhaps referring to Redden's mother Graciela).

Makenna declared Spiga told her in January 2022 that, if her brother "took advantage of the programming and opportunities in prison, [he] would be out in five to eight years." Graciela declared she also spoke with Spiga in January 2022. Graciela stated,

> "He indicated to me that this was his best
> option, and that he would be out of prison in
> five to eight years.  This was his only choice.
> He told me that he had no defense.  He would
> be sentenced to fifteen years to life in state
> prison, but he assured me that he would
> be released while he was still a young man."

Loebl declared he was in a car with Makenna when she had a conversation with Spiga.  Loebl stated, "Mr. Spiga informed Makenna that [Redden] was going to plead no contest and be sentenced to fifteen years to life.  He indicated that if [Redden] did not get in trouble in custody, and if he participated in programming and educational opportunities, he would do about half that, and serve between five and eight years."

Mora declared she spoke with Spiga in September 2021. She stated Spiga told her that, "[I]f [Redden was] sentenced to fifteen to life, he would only do about seven years based on programming in state prison. [¶] He explained that he would get fifteen percent credit[s] for his time in custody.  Additionally, once he is transferred to state prison, his credits could increase to

as great as thirty percent." Mora declared she "took handwritten notes regarding [their] conversation."[8]

The prosecution filed an opposition to Redden's motion. The prosecution asserted, "[B]ased on current CDCR credits, defendant *could* be eligible for a parole hearing in as little as 5 to 8 years." The prosecution explained that, after Proposition 57 was passed, inmates such as Redden could earn 33.3 percent good conduct credits. The prosecution also contended Spiga's assessment of Redden's chances of parole at his first hearing, as well as his assessment of the strength of any defense, were "not unreasonable." The prosecution stated, "[T]he offer for which defendant pled was the best possible deal the People were willing to offer."

The prosecution attached a declaration from Spiga. Spiga declared he never told Redden "or anyone else he would be paroled in 5–8 years." Spiga had given Makenna a memorandum from the Prison Law Office (also attached to his declaration) that "detail[ed] a current breakdown of CDCR's credits and prison programming." Spiga told Redden he'd be eligible for a youth offender parole hearing in 15, 20, or 25 years if he was still in custody. Spiga declared he told Redden he "stood a good chance at early parole as long as he rehabilitated and did not pick up any disciplinary violations in prison." Spiga never told Redden "or anyone else his early parole was a certainty."

The court conducted an evidentiary hearing over the course of four days. The court heard from seven witnesses, including Redden. The court admitted exhibits submitted by both Redden and the prosecution.

---

8        Of the four declarations, the only one that mentioned credits was Mora's. Redden did not declare Spiga misadvised him about credits.

10

At the hearing, Makenna Redden testified Spiga called her in January 2022 and told her "he'd be pleading [Redden] to 15 to life." Makenna otherwise essentially repeated the contents of her declaration. Makenna never was a party to any conversations between Redden and Spiga.

Loebl testified he was with Makenna during her January 2022 conversation with Spiga. Spiga told Makenna that Redden "would be eligible for early release in half the time, which, you know, was eight years and possibly less if he had followed the programs and stayed out of trouble." When Stein asked Loebl if he remembered Spiga using the word "five," Loebl said, "Yes." Stein asked if "there [was] any mention of youth offender status." Loebl answered, "Yes." Contrary to Makenna's testimony that Spiga expressly said Redden *would* be out in five to eight years, Loebl testified Spiga said Redden *could* be out in that time.

Graciela essentially repeated what was in her declaration. She also testified Spiga had given them "a piece of paper from C.D.[C.R.]," which she confirmed was the Prison Law Office document attached to the prosecution's brief. Graciela didn't recall if Spiga spoke with her about "33 percent credit." She denied Spiga told her Redden could be eligible for parole in nine years. Graciela admitted Spiga had told her the black box data from Redden's SUV showed he'd been going 82 miles per hour.

Mora testified Spiga told her Redden "would be released in five to seven years." She admitted she'd written in her notes six to seven years depending on programming. Mora said Spiga told her Redden "would probably not get paroled the first time but probably the second time." Mora denied Spiga had told her Redden could be paroled after nine years but then admitted she'd written in her notes, " 'He can parole in nine years.' "

Spiga testified he tried his best to get the prosecution to make an offer of a determinate sentence. The lowest offer the

11

prosecution would make was 15 years to life. Spiga denied telling Redden, Makenna, or Graciela that Redden would be out in five to eight years. Nor did he tell Mora that Redden would "be out in about seven years."

Spiga noted video showed Redden's SUV going down Rosecrans "at a very, very high rate of speed while swerving." One video also showed Redden—at the moment he lost control of the SUV—with "a balloon of nitrous oxide directly in front of his face." As Redden hit the center divider, "the event data recorder" showed he was "almost flooring it." Another "extremely graphic video" from a nearby restaurant showed the SUV "barrel rolling several times" and "ejecting the . . . unfortunately eviscerated body of the victim."

In Spiga's view, Redden's case was "not a good case to go to trial on" given that video showed his "stunningly reckless act" of "driving a vehicle down a city street, running red lights, swerving while imbibing nitrous oxide." In addition, Redden was on probation for a DUI when he committed the crimes in this case, and he had a pending DUI in Orange County, where he'd been driving more than 100 miles per hour while under the influence of cannabis.

Stein called Mark Rafferty as a witness. Raffety is an attorney specializing in "alcohol-related offenses dealing with the motor vehicle." He has "handl[ed]" more than 4,000 DUI cases. Graciela Redden came to see him and he spoke with her for two to three hours. Rafferty also spoke with Austin Redden, and he read the preliminary hearing transcript, the arrest report, and other documents in the case.

Rafferty testified he "could not understand why any defense counsel would plead [his client] in this scenario." Rafferty also was "concern[ed]" about "the information that the defendant had in regard to the consequences of a plea

12

of guilty to the second degree murder and his understanding of the consequences." In Rafferty's opinion, Spiga should have retained an accident reconstruction expert[9] as well as a forensic toxicologist.[10] While admitting he didn't "do parole work much" and didn't "have experience in the parole board," Rafferty opined Redden's prior DUI conviction "would have a devastating effect" on his chances of release on parole.

On cross-examination, Rafferty said he had handled "[p]robably one or two" cases involving nitrous oxide, adding, "[i]t's rare." Rafferty had not seen any of the videos in the case.

The last witness to testify was Austin Redden. Redden said Spiga told him that, "without a doubt," he "was going to be able to parole in five to seven years if [he] programmed and just stayed straight line." That five to seven years was "[o]n top of the time [Redden] had been in."[11] Redden first claimed Spiga never told him he "could do a life sentence"; then he testified Spiga did tell him "[t]hat it could be life." Redden continued, "But he told me that he didn't see me doing that many years." Redden said Spiga told him he'd "likely" be released at his first parole hearing.

---

[9] Stein asked Rafferty about an accident reconstruction report apparently prepared in a related civil lawsuit arising from the crash.

[10] Stein asked Spiga during his testimony if he'd hired "a human factors expert." Stein didn't explain what he meant by that term.

[11] Redden was arrested on May 13, 2019, and entered his guilty pleas on January 27, 2022. As of that date he had credit for 991 actual days. Redden's sentencing—and therefore his transfer to state prison—was delayed for more than a year because of his motion to withdraw his plea.

13

Redden admitted Spiga told him about the 15 years to life exposure, but he "wasn't thinking [he] was going to get that." The prosecutor asked, "You knew that was a possibility, but you hoped to get out sooner?" Redden replied, "Yeah." In response to the prosecutor's question whether, when he entered his plea, he would have preferred a sentence of 15 years to life "[a]s opposed to 23 years to life," Redden answered, "Yeah."

On the fourth day of the hearing, February 10, 2023, the court—together with counsel—watched "six incident videos" taken from three businesses near the crash. After hearing oral argument, at length, from counsel, the court denied Redden's motion to withdraw his plea.

The court found that, while Spiga did tell Redden "he could be paroled within five to seven years if he programmed and stayed out of trouble," he "did not promise [Redden] that he would be paroled within five to seven years." The court noted "the basis for the motion to withdraw" was that Spiga was incorrect about credits. However, after the passage of Proposition 57, the court continued, inmates are "eligible to earn 33 percent credits in prison." The defense—the court said—had not disputed this and instead "ha[d] pivoted" to "put forth other arguments why the plea should be withdrawn."

While noting Redden "fault[ed]" Spiga for failing to retain experts or file certain motions,[12] the court found Redden had not

---

[12] Stein contended Spiga should have filed a motion to suppress—under *Miranda v. Arizona* (1966) 384 U.S. 436—the statements Redden made to the officer who came to the hospital. Stein also asserted Spiga should have filed a motion under Penal Code section 995 challenging the magistrate's order holding Spiga to answer, apparently on the issue of whether Redden was "under the influence" at the time of the crash.

14

been prejudiced by any of those failures. The court stated, "I think Mr. Spiga was correct in his analysis of the case, and that is that even if the People were unable to prove impairment, the defendant's driving was so reckless that he could still be liable for implied malice murder." There are "a number of factors that can be considered" in determining if conduct "qualifies for second degree murder," the court said, "among them, speed, the manner of driving, the ingestion of the narcotics, [and] whether or not the defendant was under the influence of that narcotic at the time of the incident." The court continued,

> "[B]ut the fact that there were nitrous oxide balloons passed around the vehicle is certainly evidence of conscious disregard for human life. Mr. Spiga was entitled—not only entitled but right to consider that in advising Mr. Redden about his options and about whether or not to plead in this case. In fact, had he not done so, that, in this court's view, would be a greater

---

Stein did not mention either of these alleged failures in his motion to withdraw the plea, but he raised them at the hearing.

Spiga testified at the hearing that he didn't file a suppression motion because "[t]he statement was not in violation of *Miranda*." Spiga said he had "looked at the case law on this issue" and there was "not one single case in the state of California that shows that a hospital interrogation is a violation of *Miranda*." (See, e.g., *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1090–1091 [defendant not "in custody" for *Miranda* purposes when questioned while being treated in ambulance by paramedics].) As for a section 995 motion, Spiga testified Redden's "admissions were sufficient to get him past the preliminary hearing stage." In Spiga's view, Redden's "chances of winning a 995 were very slim as were his chances of winning a suppression motion under *Miranda*."

15

dereliction of duty.  I find that the defense
has not demonstrated good cause to withdraw
the plea."

The court then sentenced Redden in accordance with his plea agreement to 15 years to life for the murder and eight years for the DUI, consisting of the high term of three years plus five years for the great bodily injury enhancement, to be served concurrently with the murder count.  The court stayed the multiple victim enhancement.

Redden filed a notice of appeal and the trial court granted his request for a certificate of probable cause.

## DISCUSSION

### 1. *Governing law*

Penal Code section 1018 provides a court, on application by a defendant, may, "for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted."[13] To establish good cause to withdraw a guilty plea, the defendant must show by clear and convincing evidence that he was operating under mistake, ignorance, or any other factor overcoming the exercise of his free judgment, including inadvertence, fraud, or duress.  (*People v. Archer* (2014) 230 Cal.App.4th 693, 702 (*Archer*); *People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416 (*Breslin*).)  "[I]t is settled that good cause does not include mere 'buyer's remorse' regarding a plea deal." (*People v. Simmons* (2015) 233 Cal.App.4th 1458, 1466.)

The Legislature has stated section 1018 "shall be liberally construed to effect these objects and to promote justice." (§ 1018.)  However, "leave to withdraw a plea with its resulting inconvenience and expense should not be lightly granted."

---

[13]     References to statutes are to the Penal Code.

(*People v. Waters* (1975) 52 Cal.App.3d 323, 331; *Archer, supra,* 230 Cal.App.4th at p. 702 [guilty pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged].  See also 4 Witkin and Epstein, Cal. Criminal Law (4th ed. 2023) Withdrawal of Guilty Plea, § 326 [the " 'good cause shown' " language in section 1018 "recognizes the long-established rule that leave to withdraw a plea, with its resulting inconvenience and waste of time and effort of courts and prosecuting officers, should not be lightly granted"].)  Moreover, the promotion of justice "require[s] a consideration of the rights of the respondent, The People of the State of California, as well as those of the appellant."  (*Waters,* at p. 331.)

"The decision to grant or deny a motion to withdraw a guilty plea is left to the sound discretion of the trial court." (*Breslin, supra,* 205 Cal.App.4th at p. 1416; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254 [a decision to deny a motion to withdraw a guilty plea is final unless the defendant can show a clear abuse of the trial court's discretion].)  "We are required to accept all factual findings of the trial court that are supported by substantial evidence."  (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 917.)  That we review a trial court's ruling on a section 1018 motion under the " 'abuse of discretion' " standard appropriately results in our paying considerable deference to the trial court's factual findings.  (*Archer, supra,* 230 Cal.App.4th at p. 702.) All questions of the weight and sufficiency of the evidence are addressed in the first instance to the trier of fact—here, the trial judge.  (*Ibid.*)

**2.**   ***Substantial evidence supports the trial court's findings and it did not abuse its discretion in denying Redden's motion to withdraw his pleas***

When Redden entered his guilty pleas on January 27, 2022, Spiga first told the court the terms of Redden's agreement with

the People.  Spiga said the prosecution was "recommend[ing]" "15 to life" on the murder count.  Spiga explained the agreed-upon sentence on the DUI count and that it would be served concurrently with the murder count.

The court then stated, "So that's a total term of 15 years to life."  The court addressed Redden directly:  "Mr. Redden, is that your understanding of the agreement?"  Redden replied, "Yes, Your Honor."  After stating the maximum possible sentence, the court told Redden, "I'll be sentencing you to 15 years to life in state prison . . . ."  In response to more questioning by the court, Redden confirmed he understood the "potential consequences" of his pleas, he had had enough time to discuss the case "and the terms of the offer" with Spiga, and he was entering his pleas "freely and voluntarily and because [it was] in [his] best interests to do so."  The court asked Redden, "Do you have any questions before I take your pleas?"  Redden answered, "No, Your Honor."  Redden never asked the court about credits, nor told the court it was his understanding he'd serve only five to eight years.

On appeal, Redden does not dispute any of this exchange or claim he didn't understand he was pleading to an indeterminate life sentence.  Instead, he contends Spiga was constitutionally ineffective.  Redden asserts he "only accepted" the 15 years to life offer because Spiga advised him he'd be eligible for parole in five to eight years.  Redden also argues Spiga "advis[ed] him to plead . . . at a point in the proceedings where counsel had not yet filed any pre-trial motions; hired any experts; or done any meaningful investigation."

A defendant "is entitled to effective assistance of counsel in determining whether to accept or reject a plea bargain." (*Archer*, *supra*, 230 Cal.App.5th at p. 707.)  To establish a claim for ineffective assistance of counsel, a defendant must show his counsel's performance fell below an objective standard of

18

reasonableness under prevailing professional norms and he suffered prejudice as a result of that deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–692; *People v. Codinha* (2021) 71 Cal.App.5th 1047, 1064 (*Codinha*); *Breslin*, *supra*, 205 Cal.App.4th at p. 1418.)

While the trial court found Spiga told Redden "he could be paroled within five to seven years if he programmed and stayed out of trouble," the court also found Spiga "did not promise him that he would be paroled within five to seven years." On cross-examination Redden conceded he knew 15 years to life was a possibility but he hoped to be released sooner.

Even if Spiga acted unreasonably in incorrectly estimating a likely release date, Redden has not carried his burden of showing a reasonable probability that—but for counsel's incompetence—he would not have pleaded guilty. (*Codinha*, *supra*, 71 Cal.App.5th at p. 1069; see *People v. Patterson* (2017) 2 Cal.5th 885, 901.) While Redden's declaration stated he would have "insisted" Spiga "continue to negotiate for a better disposition, or proceed to trial" had he "been aware" there was "a substantial likelihood" he'd serve 20 years, or perhaps life, he never testified to that at the hearing. When asked on direct examination why he pleaded guilty, Redden replied, "Because he told me it was of [*sic*] my best interest; that if I didn't, I would get 24 to life." When asked if "one of the reasons [he] took the deal" was Spiga told him he'd be "out in five to seven years," Redden answered, "Yeah."

Redden made no showing in the trial court, or here on appeal, that he has "a potentially meritorious defense." (See *Breslin*, *supra*, 205 Cal.App.4th at p. 1416.) For example, he has not cited any case in which a suspect's statements to an officer— made not "in custody" but rather in a hospital—were suppressed under *Miranda*. Moreover, even if a motion to suppress Redden's

statements were successful, his passenger Castillo heard the sound of the compressor three or four times minutes before the crash, and a first responder found a canister of nitrous oxide in Redden's SUV. A video showed Redden with a balloon just in front of his lips as he lost control of the SUV. As for "continu[ing] to negotiate for a better disposition," the prosecutor made clear the People would not have agreed to anything less than a murder conviction with a life sentence.

In sum, after evaluating the totality of the circumstances, the trial court acted well within its discretion in ruling Redden had failed to meet his burden by clear and convincing evidence to show he entered his guilty pleas under mistake, ignorance, or any other factor overcoming his exercise of free judgment. (See *Breslin*, *supra*, 205 Cal.App.4th at pp. 1412, 1418, 1421 [affirming denial of motion to withdraw plea; counsel's failure to discover before defendant's plea that victim had attempted to recant his statement to police did not constitute ineffective assistance; defendant's " 'self-serving statement' " that she would not have " 'accepted a proffered plea bargain[ ] is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice' "]; *Codinha*, *supra*, 71 Cal.App.5th at pp.1054, 1063–1064, 1069–1070 [affirming denial of motion to withdraw plea; counsel was not ineffective in failing to tell defendant a possible consequence of his plea was an indeterminate commitment as a sexually violent predator]; *Archer*, *supra*, 230 Cal.App.4th at pp. 707–708 [affirming denial of motion to withdraw plea; counsel was not ineffective in failing to take into account section 654 issue in advising defendant of maximum possible sentence].)

3. *The sentence and the abstract must be corrected*

At sentencing, the court stated, "The court stays the multiple victim enhancement under Vehicle Code section 23558 . . . with respect to count 2 of the information." However,

20

the multiple victim enhancement should have been stricken, as Redden did not admit it in entering his plea. The minute order dated February 10, 2023, states, "The court stayed the enhancement pursuant to Vehicle Code section 23558 (multiple victims), but this should be stricken because defendant did not admit to it." The abstract of judgment says the same thing. However, the record on appeal contains no minute order actually striking the enhancement, and the abstract of judgment shows the enhancement imposed and stayed. On remand, the court is to strike the enhancement and prepare an amended and corrected minute order.

In addition, with respect to restitution, the court stated, "Defendant . . . is ordered to pay a $300 restitution—well, actually, given the nature of the offense here, defendant is to pay $1000 in victim restitution, $30 criminal conviction fee, $40 security fee, a $300 victim restitution fund fine. A $1000 parole revocation fine is stayed." The minute order states, "The defendant is to pay a restitution fine pursuant to section 1202.4(b) Penal Code in the amount of $1000." While ordinarily the court's oral pronouncement controls in the case of a discrepancy, it appears here the minute order is correct and the court merely misspoke when it referred to both "$1000 in victim restitution" and "a $300 victim restitution fund fine."

One final problem: The abstract of judgment incorrectly lists $2000 as the amounts of both the restitution fund fine and the parole revocation fine. The court is to prepare a corrected abstract of judgment—listing the $1000 amounts—and to forward it to the Department of Corrections and Rehabilitation.

21

**DISPOSITION**

We affirm Austin Hunter Redden's conviction.  We remand the matter for the trial court to strike the multiple victim enhancement and to prepare a corrected minute order and abstract of judgment.  The trial court is to forward the corrected minute order and abstract to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.