Filed 8/15/25  P. v. Ayala CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C101934 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF16-0005596-02) |
| v. | |
| FELIZ RUBEN AYALA, | |
| Defendant and Appellant. | |

Defendant Felix Ruben Ayala was found guilty of 35 offenses, including one murder, for his involvement in a series of robberies and a killing.  The trial court originally sentenced defendant to an aggregate term of 39 years to life in prison plus 36 years determinate, but later vacated defendant's murder conviction.  The court resentenced defendant to an aggregate determinate term of 32 years, plus life terms on two kidnapping counts.  On appeal, defendant argues that (1) the trial court abused its discretion in imposing the sentence that it did, (2) the trial court erred in ordering him to pay restitution to the family of the murder victim because his murder conviction has been vacated, and (3) the abstract of judgment must be corrected to accurately reflect his custody credits.  We will order the abstract of judgment corrected and affirm.

1

BACKGROUND

In the previous appeal from judgment, another panel of this court summarized the factual background underlying the various counts, in relevant part, as follows:

"*A.    October 2, 2015 (Counts 32-35)*

"Phil,[1] Elioenaid Rivera, and Sergio Martinez drove from New York on September 29, 2015, and arrived in Red Bluff on October 2.  At 3:00 p.m. that day, Phil took a video of himself, [defendant], and [codefendant Jose Orlando] Luna in which he referred to them as the 'dream team.'

"At the time, [defendant] and Luna lived on [John Deanzo's] property in Shingletown.  They helped him clean up the property and set up an indoor marijuana grow.  John would let [defendant] and Luna borrow his silver car.

"B.T. was an employee at a hydroponics store who lived in Shasta Lake City, where he grew marijuana at his residence.  He knew [defendant] through the store, and [defendant] had been to B.T.'s residence to buy marijuana.  B.T. testified that, on October 2, he was planning to harvest his marijuana.  That evening, Martinez and Rivera pulled into his driveway in a silver car that B.T. had seen [defendant] driving a few months earlier.  They asked if a car that was broken down in B.T.'s driveway was for sale.  When B.T. said no, they drove away but then made a U-turn and parked 50 to 75 yards away.  B.T. went to confront them with his dog, but they left before he reached them.  B.T. kept walking around the block and saw [defendant] and Luna in a different vehicle.  B.T. expressed concern about what had happened with Martinez and Rivera, but [defendant] and Luna drove away.

---

1    Because defendant Felix Ruben Ayala (born in 1979) has the same name as one of his codefendants, the opinion on the previous appeal from the judgment referred to defendant as "Ruben."  The opinion referred to codefendant Felix Ruben Ayala (born in 1971), who is not a party to this appeal, as "Phil."

"Shortly after B.T. returned home, the silver car pulled into his driveaway [*sic*] again. B.T. armed himself with a shotgun. When B.T. opened the door, Martinez pointed a semiautomatic pistol at him. One of the two men struck and disarmed B.T., and then B.T. wrestled with Martinez. Martinez fired his gun, leaving a hole in the front door. The men fled when one of B.T.'s roommates emerged from the house armed.

[¶] · · · [¶]

"B.     *October 4, 2015 (Counts 1-6)*

"Bradley was a regular customer at a store that sold used [marijuana] grow equipment. On September 28, 2015, he was at that store talking to [defendant].

"By October, Bradley's marijuana was ready to be harvested and some of it was being harvested.

"On the evening of October 4, 2015, Bradley was discovered dead on the floor of his kitchen in Redding.

"The front door was closed, and there were two bloody shoe prints on the porch that appeared to come from different shoes.

"A zip tie around Bradley's right wrist was connected to another zip tie that was enclosed but not attached to his body. Two more zip ties that were interconnected were next to his body. His hand had hair stuck to it.

"One of the bedrooms had remnants of what looked like marijuana. It had no bed and appeared to be a place to store or dry marijuana. There were marijuana plants in the backyard and hanging from the garage ceiling.

"On the carpet in the living room and near the entryway to the hallway, officers found a diamond stud earring. They also found buckets of marijuana inside the house. The cupboard doors were opened. DNA from the earring matched Rivera's.

"Bradley's computer was last used at around 2:15 p.m.

"The forensic pathologist who performed an autopsy on Bradley testified that his cause of death was 'multimodality homicidal violence.' Bradley 'had an injury of every

3

class.'  He had injuries caused by sharp instruments, such as a seven-inch incision on the front of his neck, and injuries caused by blunt force, including a fractured nose and broken ribs.  The neck incision came last.

"The investigator presented evidence that defendants' [cell] phones all utilized the cell tower closest to Bradley's residence between 2:19 p.m. and 2:44 p.m. on October 4, 2015.  There were calls between [defendant] and Luna, Martinez and Luna, and Martinez and Phil.  By 8:00 p.m., [defendant's cell] phone was in Shingletown (where he lived with Luna) while Martinez's and Phil's [cell] phones were in Red Bluff.  Phil and Martinez headed back to New York City, arriving on October 10.  During the drive, Phil took a video of himself, Martinez, and another man in which Martinez said, 'You call me hitman.  You call me the price is right.'  Martinez asks, 'What are we up to like I think what 26?' and the man responds, 'You up to 35 bodies right now.'  On October 20, Phil and Martinez left New York.  On October 22, they arrived back in Red Bluff.

"*C.    October 25, 2015 (Counts 7-20)*

"On October 25, 2015, Michael lived in Live Oak with his mother, father, Jennifer, and Jennifer's two children.  Robert rented the guest house.  Michael had harvested 52 of the approximately 85 marijuana plants growing on his property, while the remainder, which belonged to Robert, had not been.

"Michael's father saw three or four men approach the house wearing shirts or jackets with 'DEA' on them.  Michael's father testified that one of the men was Phil, and Phil was carrying a rifle or shotgun.  Michael's father told the men that the marijuana grow was legal, and Phil responded that it was not recognized by the federal government.  Phil led Michael's father inside and told him to stay in the living room.

"Michael testified that his father came in and said federal agents were there.  Phil and another man took Michael to the living room and sat him down with his father.  One of the men had a shotgun.  Phil had been to Michael's house with another man about three weeks earlier asking to buy marijuana.  Michael had said he did not sell it.

4

"Jennifer testified that a man with a gun led her to the living room. When they were there, he threatened her daughters with his gun pointed at them. She saw five strangers in total. Phil did not have a weapon, but he was giving orders.

"Robert testified that he and Joe were almost finished processing marijuana in Robert's house when several men, including [defendant], entered, threw Robert on the ground, and put a gun to his head. After 15 or 20 minutes in which the men removed tubs of marijuana and searched the house, Robert and Joe were taken to the main residence by gunpoint. They were put in the living room with Michael, his parents, Jennifer, and Jennifer's children, and told to sit quietly.

"Once everyone was in the living room, the intruders went through other rooms. They removed tubs of marijuana from the main house as well. Michael realized the men were not law enforcement when he saw them wiping off the front door handle as they left. After they left, Michael learned the phone line had been cut. Other items were stolen in addition to marijuana, including firearms, cell phones, and laptops.

[¶] . . . [¶]

"D.    *October 26, 2015 (Counts 21-31)*

"John testified that, on October 26, 2015, Luna drove him in a U-Haul to a hardware store to meet Larry while [defendant] went in a truck. Phil arrived in a car with three other people. Larry arrived in his green van. John explained that Larry's van left, and then John, Larry, and Luna got into the U-Haul. When they left, John did not know where they were going, but when they arrived at the hydroponics store, he recalled a previous discussion about getting soil. Luna backed in the U-Haul for loading and was on his [cell] phone speaking in Spanish.

"B.T., Taylor, and Jason were working at the hydroponics store in Redding. About 30 minutes before the store closed at 6:00 p.m., a young Hispanic man entered and asked about a $5,000 trimming machine despite not having $20 to buy the item he placed on the counter.

5

"At about ten minutes before closing, Taylor saw a green van pull into the parking lot and then leave.

"Shortly before 6:00 p.m., three men came into the store across the street, including Phil who purchased a drone. He was talking on the [cell] phone in Spanish. One of the men went to the window that faced the hydroponics store.

"Meanwhile, back across the street, Marc entered the hydroponics store to buy scissors. There were no other customers.

"Two or three men entered wearing 'DEA' uniforms and told everyone to get down on the floor. Taylor recognized one of them from the van. B.T. recognized Rivera and Martinez from their earlier encounter at his home. Martinez had a semiautomatic handgun. B.T. did not get down, and Martinez struck him with the gun, causing B.T. to lose consciousness.

"One of the men handcuffed Marc and took some of his belongings, including at least $300. The men took cash from Taylor and the register as well. They also asked for marijuana but were told the store had none.

"The men took the trimming machine. They were talking to someone outside of the store in Spanish using a radio or cell phone. One of them said, 'Yes. Yes, Sergeant. We have all the suspects detained. Bring in the van for transport.'

"When B.T. regained consciousness, he was led outside to a green van. There was another vehicle there with several individuals waiting outside of it. B.T. told the men he could get them into the safe if they took him back inside. They did so, and he gave them the instructions for opening the safe. The men then took cash from the safe.

"John testified that he walked into the store and saw what appeared to be one of the men from the hardware store with a gun on his hip and wearing a DEA uniform. John returned to the U-Haul and told Luna and Larry that he wanted to leave because there was a raid going on. Luna stayed, while John and Larry left on foot. As he left, John saw the man with the gun leading another man out to the van. John also thought he saw the car

6

that Phil had arrived at the hardware store in at the parking lot of the hydroponics store." (*People v. Luna et al.* (Apr. 21, 2022, C087634) [nonpub. opn.] (*Luna*), fn. omitted.)

In 2017, a jury found defendant guilty of first degree murder (Pen. Code,[2] § 187; count 1), conspiracy to commit robbery (§ 182, subd. (a)(1); counts 2, 7, 21, 32), residential robbery in concert (§§ 211, 213, subd. (a)(1)(A); count 3), first degree residential burglary (§ 459; counts 4, 15-16), assault with a firearm (§ 245, subd. (a)(2); counts 5, 17), false imprisonment by violence (§§ 236, 237, subd. (a); counts 6, 18-19, 28-30), kidnapping to commit robbery (§ 209, subd. (b); counts 8, 9), first degree residential robbery in concert (§ 211; counts 10-14), cutting a utility line (§ 591; count 20), second degree robbery (§ 211; counts 22-25), assault with a semiautomatic firearm (§ 245, subd. (b); counts 26-27, 35), taking or driving a vehicle without the owner's consent (Veh. Code, § 10851; count 31), attempted first degree robbery (§§ 664, 211; count 33), and attempted first degree burglary (§§ 664, 459; count 34). The jury also found true the allegations that, in the commission of every one of these offenses, defendant was armed with a firearm. (§ 12022, subd. (a)(1).) Defendant was originally sentenced to an aggregate term of 39 years to life plus 36 years determinate in prison.

On the appeal from the judgment, another panel of this court concluded that there was insufficient evidence to support count 31, taking or driving a vehicle without the owner's consent. (Veh. Code, § 10851.) Accordingly, the panel reversed that conviction and ordered that count dismissed. (*Luna, supra*, C087634.)

In 2023, defendant filed a motion for resentencing under former section 1170.95, now section 1172.6. After a hearing, the trial court granted the motion, vacated defendant's murder conviction, and set the matter for resentencing. In the court's ruling, it concluded: "Evidence at trial established that the attackers of Bradley . . . were

---

[2] Further undesignated statutory section references are to the Penal Code.

7

Elioenaid Rivera and Sergio Martinez. No evidence established Defendant's personal presence at the scene of the crime, and the Court finds that there is insufficient evidence to establish, beyond a reasonable doubt, that the Defendant harbored an intent that Bradley . . . be killed or that the Defendant was a primary participant in that particular crime, acting with reckless indifference to human life. . . . Although the Defendant was appropriately originally convicted of the murder given the state of the law existing at the time of his conviction, the recent changes to the law make his murder conviction unsustainable. His murder conviction: is hereby **vacated** . . . ." (Fn. omitted.)

Prior to resentencing, the trial court found true circumstances in aggravation that defendant's prior convictions were numerous or of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)),[3] that he had served a prior term in prison or county jail under section 1170, subdivision (h), (rule 4.421(b)(3)), that he was on probation, mandatory supervision, postrelease community supervision, or parole when the crimes were committed (rule 4.421(b)(4)), and that his prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory (rule 4.421(b)(5)).

The trial court denied defendant's request to strike all firearm enhancements. The court also denied his request to have his kidnapping convictions vacated and judgment imposed on the lesser included offense of false imprisonment.

The trial court resentenced defendant to an aggregate determinate term of 32 years, plus two life terms, as follows: the upper term of nine years on count 2, conspiracy to commit a crime, plus one year for the firearm enhancement attached to that count; two years, one-third the middle term, for residential robbery in concert plus four months for the firearm enhancement on counts 11 through 14; eight months, one-third the middle

---

[3] Further rules citations are to the California Rules of Court.

8

term, for false imprisonment by violence plus four months for the firearm enhancements on counts 18 and 19; one year, one-third the middle term, for second degree robbery plus four months for the firearm enhancements on counts 23 and 24; two years, one-third the middle term, for assault with a semiautomatic firearm on counts 26, 27, and 35; and indeterminate life terms on both kidnapping to commit robbery counts plus one year for the firearm enhancements attached to each kidnapping count. The court imposed and stayed sentences on the remaining counts pursuant to section 654.

DISCUSSION

I

*The Sentence Imposed*

Defendant argues that the trial court abused its discretion in sentencing him to 32 years plus two life terms. Defendant characterizes the sentence imposed as "unnecessarily long," "out of proportion to the circumstances," and likely meaning he will die in prison. He contends that he was the least culpable of the participants in the offenses. We conclude the trial court did not abuse its discretion in resentencing defendant.

"A trial court's decision to impose a particular sentence is reviewed for abuse of discretion and will not be disturbed on appeal 'unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Jones* (2009) 178 Cal.App.4th 853, 860.) " ' "[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.)

Defendant argues that the trial court could have imposed a lesser sentence by reducing counts 8 and 9 from kidnapping for robbery to the lesser included offense of

9

false imprisonment. However, while this may be true, defendant has not identified any factor or circumstance to demonstrate that the trial court's discretionary sentencing choices were an abuse of discretion. Defendant emphasizes that the victims "were moved only 20-25 feet, a relatively short distance." (See generally *People v. Simmons* (2015) 233 Cal.App.4th 1458, 1471 [there is no minimum distance a defendant must move a victim to satisfy the element for kidnapping to commit robbery that the movement of the victim was more than merely incidental to the commission of the crime].) This, however, is insufficient to establish that the trial court's sentencing choices were irrational or arbitrary and an abuse of discretion.

Defendant also correctly observes that the trial court imposed a cumulative total of five years eight months for 11 section 12022, subdivision (a), firearm enhancements. He argues that, where "there are multiple enhancements, 'all enhancements beyond a single enhancement shall be dismissed.' " Section 1385, subdivision (c)(1), provides, in part, that, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so . . . ." (§ 1385, subd. (c)(1).) Subdivision (c)(2) of that section provides, in part, that, "[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).) One of the mitigating circumstances referenced in section 1385, subdivision (c)(2), specifies: "Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)

Here, however, the trial court found that this case was a unique one "involving significant public safety issues." The court continued: "This was a series of crimes committed by a number of individuals with great plan[ning] and deliberation and resulting in, although [defendant] is not . . . legally responsible for the death of [Bradley] he was an integral part of this multi-defendant series of crimes which . . . the Court has detailed at some length in the prior hearings constitutes a significant danger to the public safety. . . ." Defendant has failed to demonstrate that the trial court abused its discretion in declining to dismiss these enhancements.

Defendant also argues that his criminal record, on which the trial court relied in imposing an aggravated term, was not properly certified. Before resentencing, the deputy district attorney submitted a California Law Enforcement Telecommunications System (CLETS) printout detailing defendant's criminal history with her certification that she received the printout. The cover page represented that the document was certified, and that the signing employee was authorized to receive responses from the CLETS database, but it did not specify "that the copy is a correct copy of the original" or anything similar. (Evid. Code, § 1531.) In any event, defendant did not object at resentencing to the court's reliance on the CLETS printout to establish his criminal history as a basis for finding a circumstance in aggravation. In fact, defense counsel acknowledged the court's authority to impose the upper term based on circumstances in aggravation involving his criminal history, but urged the court not to. Defense counsel also stated, prior to resentencing, when asked by the trial court if he had any objection to the admission of the CLETS printout, "I don't think there is a basis to object. So, no." Because he failed to object in the trial court to the adequacy of the evidence of his criminal history, defendant has forfeited the issue on appeal. (See *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [" '[c]laims of error relating to sentences "which, though otherwise permitted by law, were imposed *in a procedurally* or factually *flawed manner*" are waived on appeal if not first raised in the trial court' "].)

11

Defendant also argues that, even if the CLETS printout was properly admitted, "the trial court could not rely on it to show other aggravating circumstances such as unsatisfactory performance on parole or probation" because those circumstances were not found true by a jury or admitted by him. (See generally § 1170, subd. (b)(1)-(3).) This claim, too, is forfeited. (See *People v. Scott* (1994) 9 Cal.4th 331, 353 [forfeiture applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].) Defendant did not object to the trial court's reliance on the CLETS printout to find not only that defendant had numerous prior convictions (rule 4.421(b)(2)), but additional rule 4.421(b) circumstances in aggravation (see rule 4.421(b)(3) [defendant has served a prior prison term], rule 4.421(b)(4) [defendant was on probation or another form of supervision when the crime was committed] rule 4.421(b)(5) [defendant's prior performance on probation or another form of supervision was unsatisfactory]). Further, when the prosecutor noted that certain rule 4.421(a) circumstances must be found true by the trier of fact, but claimed that "the Court can consider" rule 4.421(b)(2) through (5) circumstances in imposing an aggravated term,[4] defendant did not object or claim that these rule 4.421(b) circumstances in aggravation *also* must be found true by the trier of fact. Thus, defendant forfeited his contention that the trial court improperly relied on the CLETS printout to find true certain rule 4.421(b) circumstances in aggravation.

To the extent defendant raises an Eighth Amendment challenge, arguing that his sentence is "out of proportion to the circumstances" (see *People v. Panighetti* (2023) 95 Cal.App.5th 978, 1002 [discussing the Eighth Amendment's " ' " 'narrow

---

[4]     While the issue is forfeited here, we note that, under recent California Supreme Court case law, "a defendant is entitled to a jury trial on all aggravating facts, other than the bare fact of a prior conviction and its elements, that expose the defendant to imposition of a sentence more serious than the statutorily provided midterm." (*People v. Wiley* (2025) 17 Cal.Cal.5th 1069, 1086, fn. omitted.)

proportionality principle' " ' "]), defendant also has forfeited that contention by failing to raise it in the trial court. "As a general rule, 'complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal.' [Citation.] A claim that a sentence is cruel or unusual requires a 'fact specific' inquiry and is forfeited if not raised below." (*People v. Baker* (2018) 20 Cal.App.5th 711, 720.)

Defendant repeatedly acknowledges that his offenses were extremely serious, but maintains the trial court abused its discretion in imposing sentence. We disagree. The court imposed a sentence based on the number and seriousness of the crimes for which defendant had been convicted, as well as his criminal history. Defendant has not shown that the sentence imposed was irrational or arbitrary, and, in the absence of such a showing, we presume the trial court acted to achieve legitimate sentencing objectives. (*People v. Carmony, supra*, 33 Cal.4th at pp. 376-377.)

II

*Restitution*

At resentencing, the prosecutor noted that, while the count convicting defendant of Bradley's murder had been vacated, counts 2 through 6 also involved Bradley. She noted that the conspiracy to commit residential robbery, in which defendant participated, resulted in Bradley's death. Therefore, according to the prosecutor, defendant remained "responsible for the result of any of the actions of the crimes that he was involved in committing." She continued, "the other charges which are stayed pursuant to [section] 654, including the false imprisonment, the assault with a firearm also contributed to Bradley['s] . . . death and so the restitution is still applicable . . . ." Discussing funeral expenses, the prosecutor argued that such expenses were the result of the robbery which led to Bradley's death, and that, "just because [defendant] is not charged with murder, doesn't mean that that robbery didn't lead to [Bradley's] death." Defense counsel disagreed, arguing there was not a sufficient nexus between the crimes of conviction "and

13

where that restitution would come from." The trial court ordered defendant to pay a total of $184,680 in restitution to Bradley's family.

Defendant argues that the trial court erred in awarding restitution to Bradley's family in connection with a murder he did not commit. He argues that he was not present at the robbery and killing of Bradley and was not a primary participant in that crime, acting with reckless indifference to human life. Defendant argues that his conduct "did not cause any death-related loss." Therefore, defendant asserts that remand is required with directions to order restitution for only that economic loss attributable to crimes of which he was convicted. We disagree.

With exceptions, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims . . . ." (§ 1202.4, subd. (f).) A "trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior . . . ." (*People v. Riddles* (2017) 9 Cal.App.5th 1248, 1252.) "To the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).) A trial court's restitution order is reviewed for abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663.)

Courts "apply tort principles of causation to determine whether a loss was a result of the defendant's conduct. [Citation.] 'Legal causation in tort law has traditionally required two elements . . . .' [Citation.] The first is cause in fact. [Citation] ' " 'An act is a cause in fact if it is a necessary antecedent of an event.' " [Citation.]' [Citation.] '[T]he "but for" test governs questions of factual causation' except in cases involving concurrent independent causes, in which case the 'substantial factor' test applies. [Citations.] '[C]oncurrent independent causes . . . are multiple forces operating at the same time and independently, each of which would have been sufficient by itself to bring

14

about the harm.' [Citation.] The second aspect of legal causation focuses on public policy considerations that limit an actor's responsibility for the consequences of his conduct.' " (*People v. Trout-Lacy* (2019) 43 Cal.App.5th 369, 372, fn. omitted.)

Defendant's conviction on count 1 for the murder of Bradley was vacated. However, defendant's convictions on counts 2 through 6 remain, in which defendant was found guilty of conspiracy to commit robbery (count 2), residential robbery in concert (count 3), first degree residential burglary (count 4), assault with a firearm (count 5), and false imprisonment by violence (count 6)—with Bradley as the victim in each count. Factually, on September 28, 2015, six days before he was found dead on October 4, 2015, Bradley was seen in a store that sold grow equipment talking to defendant. (*Luna, supra*, C087634.) Bradley's computer was last used at approximately 2:15 p.m. on October 4, 2015. (*Ibid*.) There was evidence "that defendants' [cell] phones all utilized the cell tower closest to Bradley's residence between 2:19 p.m. and 2:44 p.m. on October 4, 2015," the day Bradley was found dead. (*Ibid*.) "There were calls between [defendant] and Luna, Martinez and Luna, and Martinez and Phil." (*Ibid*.)

We conclude that the trial court did not abuse its discretion in making its restitution award. We first address the issue of cause in fact. The conspiracy to rob Bradley, the robbery, the burglary, the assault with a firearm, and the false imprisonment by violence were necessary antecedents to Bradley's death. (*People v. Trout-Lacy, supra*, 43 Cal.App.5th at p. 372.) "But for" these circumstances, defendant's confederates would not have killed Bradley. (*Id.* at pp. 372-373.)

Defendant argues that the commission of a residential robbery does not make a murder foreseeable. He relies on *People v. Clark* (2016) 63 Cal.4th 522 for the premise that "the fact that a robbery involves a gun . . . , on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life . . . ." (*Id.* at p. 617.) That passage actually continues, "for the felony-murder aider and abettor special circumstance." (*Ibid*., fn. omitted.) Of course, we are not addressing

15

that special circumstance, so this passage is of limited relevance to the circumstances before us. Defendant's argument that he did not have the intent to kill and was not a major participant who acted with reckless indifference to human life addresses the wrong question. We are not faced with the question whether defendant could be found guilty of murder. Rather, guided by tort principles, we consider whether, but for the conspiracy to rob Bradley, the robbery, the burglary, the assault with a firearm, and the false imprisonment by violence, Bradley would have been killed. And we have concluded that these acts and circumstances were a "but for" cause of Bradley's death.

To the extent that defendant's foreseeability argument is intended to suggest that his confederates' acts in killing Bradley were independent intervening causes of Bradley's death, relieving him of any liability, we disagree. " ' " 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability.' " ' " " (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1397.) That defendant's confederates, at least one of whom was armed with a firearm, would kill Bradley in the commission of the robbery, burglary, assault with a firearm, and false imprisonment by violence, cannot be said to be unforeseeable. Additionally, given the nature of the spree of robberies in which defendant was involved, it strains credulity to suggest that defendant did not know his confederates would be armed.

Defendant claims his circumstances are similar to those in *People v. Woods* (2008) 161 Cal.App.4th 1045. In *Woods*, the defendant appealed from an order of restitution to

the family of a murder victim where the defendant was convicted only as an accessory after the fact. (*Id*. at p. 1047.) The appellate court observed that "a charge of being an accessory after the fact is 'based on conduct taking place *only after* the loss was sustained.' " (*Id*. at p. 1052.) Section 1202.4 "limits the scope of victim restitution to the operative crime that resulted in the loss." (*Woods*, at p. 1052.) The *Woods* court continued, "[h]ere, the loss to the . . . family occurred because of the murder committed by Saucer. Defendant was not convicted as a coconspirator or as an aider or abettor to the murder itself. Thus his criminal conduct did not cause the loss for which compensation was sought." (*Ibid*., fn. omitted.) Here, defendant was not convicted as an accessory after the fact. He was convicted as one of several coconspirators in the robbery of Bradley, and was convicted of the crimes resulting from that conspiracy, other than murder. This is not conduct occurring only after the loss was sustained.

As for the second aspect of causation, the public policy considerations that can serve to limit a defendant's responsibility (*People v. Trout-Lacy, supra*, 43 Cal.App.5th at p. 372), defendant has not persuaded us that there are any such considerations to be served by limiting his responsibility for the consequences of his conduct.

The trial court did not abuse its discretion in making its restitution award.

III

*The Abstract of Judgment*

Defendant argues that the abstract of judgment must be corrected. Although page two of the indeterminate abstract correctly states that defendant had 3,648 days of credit for time served, consisting of 3,173 actual days and 475 local conduct credit days, the fourth page of the determinate abstract shows only 966 total days and 966 actual days. The People concede the point, and we agree. We shall order the abstract corrected so that the fourth page of the determinate abstract reflects that defendant has 3,648 days of credit for time served, consisting of 3,173 actual days and 475 local conduct credit days.

17

DISPOSITION

The June 7, 2024, order granting defendant's petition for resentencing and resentencing defendant is affirmed. The trial court is directed to amend the fourth page of the determinate abstract of judgment to reflect the total credits for time served as 3,648 days, actual credits as 3,173 days, and local conduct credits as 475 days, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Mauro, Acting P.J.

_____\s\_____,
Wiseman, J.*

---

\*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.